## MISSOURI, O. & G. RY. CO. v. STATE.

No. 1274.   Opinion Refiled November 14, 1911.

(119 Pac. 117.)

1.   RAILROADS—Regulation by Corporation Commission—Statutory Provisions.   The act of May 20, 1908 (Laws 1908, c. 18), does not extend the jurisdiction of the Corporation Commission beyond the metes and bounds fixed by article 9, sec. 18, of the Constitution, nor alter, amend, revise, or appeal sections of the Constitution from 18 to 34, inclusive, but is auxiliary and supplemental to said section 18, and provides a remedy for the enforcement and protection of certain rights thereby secured, and by legislative construction defines those rights so that their exact limits may be known.

2.   CONSTITUTIONAL LAW — Construction — Legislative Construction — "Public Facilities" — "Public Conveniences" — Union Depots.   A clause in the Constitution and act passed by the first Legislature after the adoption of the Constitution, relating to the same subject, like statutes in pari materia, are to be construed together.   And where such act impliedly construes "public facilities" or "public conveniences," as used in article 9, section 18, to include a union passenger depot, such contemporary interpretation is entitled to great weight, and in this instance, being correct, will not be disturbed.

3.   RAILROADS—Regulation—Compulsory Union Depots.   The act of May 20, 1908 (Laws 1908, c. 18), requiring every railroad company operating a railroad in this state to make such physical connections, transfer, and switching facilities at certain points as may be ordered by the Corporation Commission, and empowering said commission, on complaint or on its own motion, to require such companies to make such physical connections and establish and maintain union depots, etc., as the public interest may require, is a valid exercise of legislative power.   And where it appears that appellant was incorporated under the laws of this state, and thus acquired its right of way and station grounds at D., that the effect of the order would be to compel it to fail to comply with the conditions attached to a bonus of $10,000 to be used in the construction of a depot upon said grounds and abandon its right of way, and, in order to extend its tracks to the union depot ordered operated at D., to deflect its main line of road and run through two elevators, grade an additional roadbed, and curve its track so acutely as to cause delay in handling its trains, all at a cost of about $50,000, held, notwithstanding, that the act and the proceedings thereunder are valid either as a proper exercise of the police power of the state or as a reasonable exercise of the right reserved to the Legislature to amend, alter, or repeal the charter of appellant.

4.   STATUTES—Implied Powers.   Where a power is given by statute,

there is carried with it power to do everything reasonably necessary to make it effective.

(Syllabus by the Court.)

*Appeal from the Corporation Commission.*

Proceedings by the State against the Missouri, Oklahoma & Gulf Railway Company and others to compel operation of a joint depot. From an order of the Corporation Commission, requiring such a depot, the mentioned defendant appeals. Affirmed.

*Alexander New,· E. R. Jones,* and *Arthur Miller,* for appellant.

*Chas. West,* Atty. Gen., and *E. G. Spilman,* Asst. Atty. Gen., for the State.

TURNER, C. J.   At the conclusion of the testimony taken on the hearing of the petition of several residents of Durant, a city of 5,300 inhabitants, theretofore filed before it, wherein they complain of the St. Louis & San Francisco Railroad Company, the Missouri, Kansas & Texas Railway Company, and the Missouri, Oklahoma & Gulf Railway Company, defendants, the Corporation Commission on August 10, 1910, found:

"It is shown from the evidence that the Missouri, Kansas & Texas Railway and the Arkansas & Choctaw branch of the Frisco intersect at the town of Durant, and that said railway companies maintain a joint depot; that the Missouri, Oklahoma & Gulf has secured right of way through the town of Durant; that said right of way crosses the Missouri, Kansas & Texas Railway in the north part of the town and parallels the said railway from said crossing to the Arkansas & Choctaw branch of the Frisco, 470 feet east of the Missouri, Kansas & Texas and Frisco crossing; that the proposed site of the Missouri, Oklahoma & Gulf depot is south and east of the main street in the town of Durant and 400 feet east of the north end of the joint depot used by the Missouri, Kansas & Texas and Frisco; that the Missouri, Kansas & Texas Railway has a double track through the town of Durant; that east of said track it has a switch track and also a merchandise track east of the main line, leading to grain elevators; that there is a great deal of switching done on those tracks by the Missouri, Kansas & Texas; that passengers arriving   over   the

Vol 29—21

Missouri, Kansas & Texas and Frisco, desiring to take a Missouri, Oklahoma & Gulf train, would have to cross these two tracks in order to get to the proposed site of the Missouri, Oklahoma & Gulf depot, thereby incurring additional expense in transferring baggage, and making it very inconvenient and dangerous for the traveling public in crossing from one depot to another. It is further shown that the present depot of the Missouri, Kansas & Texas Railway and Frisco Railroad is very convenient to the business part of the town, being located one block off the main street; that this depot is equipped with ample facilities to take care of the business of the three roads in the town of Durant at the present time; that a union depot can be maintained at much less expense to the railroads than separate depots. It appears from the testimony of the engineer of the Missouri, Oklahoma & Gulf Railway that it would be very expensive for said railway to secure right of way and run a track to connect with the joint depot of the Missouri, Kansas & Texas and Frisco; that the Missouri, Kansas & Texas and Missouri, Oklahoma & Gulf are competitive roads, and that the passenger traffic would be greatly decreased over the Missouri, Oklahoma & Gulf owing to the fact that the agent would be employed by the Missouri, Kansas & Texas and would invariably send passengers over the Missouri, Kansas & Texas, instead of sending them over the Missouri, Oklahoma & Gulf. After a thorough investigation and careful consideration of the evidence, the commission is of the opinion that the greater number of citizens of Durant and the traveling public would be better accommodated by the maintenance of a union passenger depot than by separate depots in the town of Durant; that it would be dangerous for passengers transferring from one depot to another; and that the proper safety and accommodations of the traveling public and the people of the town of Durant require a passenger depot used jointly by the Frisco, Missouri, Kansas & Texas, and Missouri, Oklahoma & Gulf Railways in the said town."

—And ordered:

"* * * That the St. Louis & San Francisco Railroad Company, the Missouri, Kansas & Texas Railway Company, and the Missouri, Oklahoma & Gulf Railway operate a joint passenger depot in the town of Durant at the present site of the depot used by the St. Louis & San Francisco and Missouri, Kansas & Texas Railway Companies in said town, suitable for the accommodation of the passenger traffic into and out of said town, and that said

depot shall be used jointly by said companies on and after the 1st day of December, 1909, and maintained for such joint use until further orders of this commission."

From which said order the Missouri, Oklahoma & Gulf Railway Company alone appeals.

Assailing the order, appellant contends: That the commission was without jurisdiction to make it, because the same was based on the act of May 20, 1908, which, it is urged, extends that jurisdiction beyond the metes and bounds fixed by article 9, § 18, Const., which reads:

"The commission shall have the power and authority and be charged with the duty of supervising, regulating, and controlling all transportation and transmission companies doing business in this state, in all matters relating to the performance of their public duties and their charges therefor, and of correcting abuses and preventing unjust discrimination and extortion by such companies; and to that end the commission shall, from time to time, prescribe and enforce against such companies, in the manner hereinafter authorized, such rates, charges, classifications of traffic, and rules and regulations, and shall require them to establish and maintain all such public service facilities, and conveniences as may be reasonable and just. * * *"

—And which said act, having been passed prior to the time fixed in section 35 of the same article, which reads:

"After the second Monday in January, nineteen hundred and nine, the Legislature may, by law, from time to time, alter, amend, revise, or repeal sections from eighteen to thirty-four inclusive, of this article, or any of them, or any amendments thereof: Provided, that no amendment made under authority of this section shall contravene the provisions of any part of this Constitution other than the said sections last above referred to or any such amendments thereof."

—is unconstitutional and void, and for that reason the order must fall.

On the other hand, it is contended, in effect, that said act neither altered, amended, revised, nor repealed sections from 18 to 34, inclusive, but is ancillary and supplementary to said section 18 and provides a remedy for the enforcement and protection of certain rights thereby secured, and by legislative construc-

tion in a measure defines those rights so that their exact limits might be known. This latter contention is correct. Whether that part of said section authorizing the commission to require all transportation companies doing business in the state to establish and maintain all such public service facilities and conveniences as may be reasonable and just is self-executing or not, it was proper for the Legislature, acting subordinate to said provision, and in furtherance thereof, as it did, to pass the act complained of. A constitutional provision not self-executing is said, by Mr. Cooley in his work on Con. Lim. [7th Ed.] p. 121, to exist, "where it merely indicates principles without laying down rules by means of which those principles may be given the force of law." Speaking of when the power thus given is self-executing, on the next page, he says:

"Perhaps even in such cases legislation may be desirable by way of providing convenient remedies for the protection of the right secured, or of regulating the claim of the right so that its exact limits may be known and understood; but all such legislation must be subordinate to the constitutional provision, and in furtherance of its purpose, and must not in any particular attempt to narrow or embarrass it."

Quoting approvingly from *Reeves v. Anderson et al.*, 13 Wash. 17, 42 Pac. 625, Mr. Justice Williams, speaking for the court in *State ex rel. Reardon, etc., v. Scales, Mayor, et al.*, 21 Okla. 683, 97 Pac. 584, said:

"In our opinion it was competent for the Legislature to supplement the constitutional provision by pointing out the manner in which the right conferred by the Constitution might be exercised, and by prescribing rules for the guidance of the city council in relation thereto."

Such was all that was done or intended by the act of May 20, 1908 (Laws 1908, c. 18, p. 226). Indicating what was meant in said section 18 by "public facilities" and "public conveniences," the Legislature passed said act entitled, "An act to extend the jurisdiction of the Corporation Commission over all matters of physical connection, union depots, and sufficient transfer and switching facilities of the different railroads in the state of Ok-

lahoma, and requiring all railroad companies to make and main-
tain physical connections, transfers, switching facilities, and
union depots in the state of Oklahoma," thereby impliedly de-
claring that it was the legislative construction of that part of sec-
tion 18 that physical connections, transfers, switching facilities,
and union depots were included in the terms "public facilities"
and "public conveniences"; and then proceeded in the act to pro-
vide a remedy for the enforcement and protection of those rights
secured by that part of section 18 of the Constitution under
consideration. Section 1 of said act provides, in effect, that every
railroad company operating a railroad in this state shall make
such physical connections, transfers, and switching facilities at
all junction points and all incorporated towns where more than
one railroad enters as may be ordered by the Corporation Com-
mission, and that, when the interests of the public can be pro-
moted, said commission is authorized to require physical connec-
tions between two or more lines of railway where practicable,
regardless of whether the roads cross one another or not. Sec-
tion 2 makes it the duty of said commission to investigate all com-
plaints in reference to physical connections, transfers, depots, and
switching facilities at all such points, and thereupon, or upon its
own motion, to require such companies to make such physical
connection or to establish and maintain union depots, transfer
and switching facilities as the public interest may require, pro-
vided, etc. Section 3 provides:

"The expense incurred in the construction and maintenance
of the physical connections, union depots, transfer and switching
facilities mentioned in the preceding sections of this act shall be
borne by the companies operating the different lines of railroad as
such companies may agree, and in case of disagreement the Cor-
poration Commission shall determine the expense to be borne
by each, from which order the railroad company or companies
may appeal, as in other cases provided."

With the legislative construction contained in the act that a
union depot is a "public facility" or a "public convenience" with-
in the purview of that part of said section of the Constitu-
tion we have no quarrel. 32 Cyc. 748, says:

"The word 'public' has two proper meanings. A thing may be said to be public when owned by the public, anl also when its uses are public. 27 Minn. 460."

As to "facilities," 19 Cyc. 109, says:

"Applied to railroads it means everything necessary for the convenience of passengers and the safety and prompt transportation .of freight."

Or, as stated by the court in the syllabus in *C., R. I. & P. Ry. Co. v. State,* 23 Okla. 94, 99 Pac. 901:

"The phrase, 'such public service facilities and conveniences as may be reasonable and just,' as used in section 18, art. 9, of the Constitution (Bunn's Ed. § 222) means everything incident to the general, prompt, safe, arid impartial performance of the duties to the public at large imposed by the state, in the proper exercise of its police power, upon transportation and transmission companies."

And so, said act eliminated, we would have probably so held; and that a depot of that kind is such a "public facility" or "convenience" as the commission was authorized by said section alone to require appellant to. establish and maintain jointly with the other two railroads in interest. Speaking to a similar situation, the court in *Cooper Mfg. Co., etc., v. Ferguson et al.,* 113 U. S. 727, 5 Sup. Ct. 739, 28 L. Ed. 1137, said:

"As the clause in the Constitution and the act of the Legislature relate to the same subject, like statutes *in pari materia,* they are to be construed together. *Eskridge v. State,* 25 Ala. 30. The act was passed by the first Legislature that assembled after the adoption of the Constitution, and has been allowed to remain upon the statute book to the present time. It must therefore be considered as a contemporary interpretation, entitled to much weight. *Stuart v. Laird,* 1 Cranch, 299 [2 L. Ed. 115]; *Martin v. Hunter,* 1 Wheat. 304 [4 L. Ed. 97]; *Cohens v. Virginia,* 6 Wheat. 264 [5 L. Ed. 257]; *Adams v. Storey,* 1 Paine, 90 [Fed. Cas. No 66]."

We are therefore of opinion that said act must stand unless unconstitutional on other grounds.

It is next contended that as the evidence discloses appellan was incorporated under the laws of the state prior to the passage of the act, and thus acquired its right of way and station

grounds in Durant; that certain citizens of Durant have agreed to give it a bonus of $10,000 to build to that point, which said bonus is to be used to construct there a passenger depot for the erection of which station grounds were purchased; that the order of the commission based on said act will compel it, in order to extend its tracks to the union depot, to abandon said right of way and station grounds and deflect its main line at a point in the north part of said town near Elm street, and run through two elevators, and grade an additional roadbed and curve its track so acutely as to cause delay in handling its trains, all at a cost to it of not less than $50,000—that, "* * * therefore, the act is in violation of article 5 of the Constitution of the United States and sections 23 and 24 of article 2 of the Constitution of the state of Oklahoma, which deny the right of any one to take private property for private or public use without just compensation, and that provision of the national Constitution (section 1 of article 14) which provides that no state shall make or enforce any law which shall deny to any person within its jurisdiction the equal protection of the law." This was, in effect, the contention raised in *Mayor, etc., v. Norwich & Worcester Railroad Co. et al.,* 109 Mass. 103. In that case the mayor and aldermen in the city of Worcester, the Boston & Albany Railroad Company, the Worcester & Nassau Railroad Company, and the Boston, Barre & Gardner Railroad Company petitioned the Supreme Court to appoint commissioners to determine the location in the city of Worcester of a union passenger station provided for by St. 1871, c. 343, entitled: "An act to provide for a union passenger station and for the removal of railroad tracks from certain public ways and grounds in the city of Worcester." Section 1 of the act substantially provided that the Boston & Albany Railroad Company, the Worcester & Nassau Railroad Company, the Boston, Barre & Gardner Railroad Company, the Providence & Worcester Railroad Company, and the Norwich & Worcester Railroad Company might and should unite in a station in the city of Worcester for accommodations; that the Supreme Judicial Court on application of either of said corporations, or the mayor

and aldermen of the city of Worcester, either in term time or vacation, after notice, should appoint three members who, after due notice to and hearing said parties, should determine the precise location of said station within certain limits (describing them), the report of whom being returned to and accepted by the court should be binding on said parties, and the court should enter all such orders and decrees as might be necessary to carry the same into effect. Section 2 provided that said station should be erected and kept in repair at the sole expense of one of the companies and for the taking of the land by that corporation for the purpose. Section 3 provided for the use of the station by all of said companies, the others severally paying said company erecting said station a reasonable rent therefor, which, if not agreed upon, should be determined by the railroad commissioners on petition of either corporation. Section 7 directed, among other things, that, after the completion of the station, two of the companies should, respectively, discontinue the then locations of their railroads in portions of the city of Worcester. It is unnecessary to further recite the provisions of said act. In affirming the report locating the union depot the court said:

"Proof is offered that to extend the several railroads named to a union passenger station east of Grafton street would make it necessary for each of them to extend its tracks a great distance amounting in the aggregate to many thousand feet, and at a cost amounting in the aggregate to several hundred thousand dollars, and that these tracks must be laid through the heart of a populous city, and crossing over many highways, and lands must be taken now belonging to private persons,  *  *  *  For these reasons and some others to be adverted to hereafter, both the validity of the act, and of the proceedings under it, are denied, and it is contended that the report ought not to be accepted. On the other hand, the petitioners contend that the act is valid under the provisions of Gen. St. c. 68, § 41, which are similar to prior statutes affecting all railroads that have been chartered since March 11, 1831, and subjecting them to alteration, amendment, or repeal at the pleasure of the Legislature, and that the proceedings under the act are valid;"

—and sustained the latter contention. The syllabus reads:

"St. 1871, c. 343, requiring certain railroad corporations to

unite in a passenger station in the city of Worcester, at one of two specified places, to be determined by commissioners appointed by this court, to extend their tracks in that city to the union station, and, after the extension, to discontinue portions of their present locations, is constitutional and valid, being a reasonable exercise of the right reserved to the Legislature to amend, alter, or repeal the charters of those corporations."

The doctrine laid down in this case is cited with approval in *Northern Pac. Railroad v. Dustin,* 142 U. S. 492, 12 Sup Ct. 283, 35 L. Ed. 1092.

*S. A. & A. P. R. R. Co. v. State,* 79 Tex. 264, 14 S. W. 1063, was an appeal from a money judgment recovering a penalty against said railroad company for a failure to establish a depot at its crossing with the Galveston, Harrisburg & San Antonio Railroad as prescribed by an act approved May 8, 1889. The defense was that the act in question was in violation of sections 1 and 2 of article 10 of the Constitution, the first of which provided that:

"Every railroad company shall have a right with its road to enter, intersect, connect with, or cross another railroad; and it shall receive and transport each of the other's passengers, tonnage and cars, loaded or empty, without delay or discrimination, under such regulation as shall be prescribed by law."

But the court, in effect, held that the regulation prescribed by law for the purpose of carrying out that section might very properly extend to just such matters as were embodied in the act in question, and that said act simply prescribed more fully than did former laws what accommodations should be furnished at such places. To the further contention that the act in question did not apply to appellant because it had constructed its depot in the town of Flatonia before the act was passed, that it owned the lot upon which its depot was established, and that to remove said depot therefrom to the point of intersection or to erect an additional one there would materially damage the value of said lot, besides costing defendant at least $300 or $400, the court said:

"The act does not require it to remove that depot, nor does it seek to impose any penalty because it was there erected and

is there still maintained, nor does it provide a penalty for a failure to erect and maintain a depot at point of intersection prior to the time the act took effect. It matters not how many depots may have been erected and maintained by appellant at other points, for this cannot excuse it for not complying with the act in question; nor can it be said that the property of appellant or of any citizen of Flatonia, within the meaning of the Constitution, will be taken, damaged, or destroyed by the erection and maintenance of all the houses and accommodations at point of intersection which the act requires. There certainly never was a contract between appellant and the state that the former should not be required, whenever the Legislature deemed it necessary, to erect at the intersection of its road with another such buildings as were necessary for the convenience and comfort of those it serves as a public carrier of passengers."

—And affirmed the judgment of the trial court. And this for the reason we think, although the opinion does not so state, that the act was a valid exercise by the Legislature of the police power of the state.

*State v. Kansas City, etc., Ry. Co.* (C. C.) 32 Fed. 722, was a suit to recover a penalty for the violation of an act passed by the Legislature of Missouri in 1881 (Laws 1881, p. 77), requiring every railroad company in the state engaged in the transportation of passengers or property at all crossings and intersections of other roads at the same grade to erect, build, and maintain, either jointly with the railroad company whose road is crossed or separately by each railroad company, a depot, etc., under penalty of a forfeiture of a sum certain for failure so to do. On demurrer to each count of the petition, the court said that the first question to be determined was the constitutionality of the act; that such acts when sustainable were sustainable under the police power of the state; that the act in question was a valid exercise of that power, and that:

"It is no longer doubted that the Legislature may require that trains shall stop at every railroad crossing. Public safety justifies, if it does not compel, this. If the Legislature may require a stop, why may it not require a stop of sufficient length to permit passengers to get on and off, and with that require suitable depot privileges? It will be noticed that the statute does

not attempt to prescribe the size or expense of these depots. It leaves that to the discretion of the railroad companies, simply requiring that they shall be sufficient to comfortably accommodate passengers at that point. It would seem to be a reasonable exercise of the police power to compel railroad companies to furnish suitable accommodations for passengers at all places where they receive and discharge them from their trains. Public welfare, if not public safety, justifies this."

—And held the act to be constitutional and overruled the demurrer.

We think that the holding in *Mayor, etc., v. Norwich, etc., Railroad Co., supra,* is a complete answer to appellant's next contention, which is "that it is not competent for any Legislature to compel a railroad to turn over its property to its competitors or, what is the same thing, enter into a union depot arrangement with its competitors"—for the reason that in that case the Legislature compelled just such an arrangement and held the act constitutional on the ground, as stated, *supra,* in effect, that the same was a reasonable exercise of the right reserved to the Legislature to amend, alter, or repeal the charters of the corporations in interest. As a like reservation exists in this jurisdiction (Const. art. 9, § 47), we are of opinion the exercise of the power may be justified on a like ground, or on the ground, as stated by Judge Brewer in *State v. Kansas City, etc., Ry. Co., supra,* that the same is a valid exercise of the police power of the state. *Dewey v. Railroad,* 142 N. C. 392, 55 S. E. 292, is also squarely against appellant's contention. In that case the statute under construction was Revision 1905, § 1097, subsec. 3, which empowered and directed the Corporation Commission to require, when practicable, and when the necessity of the case and the judgment of the commission demanded it, any two or more railroads which then or might thereafter enter any city or town within the state to have a common or union passenger depot for the security, convenience, and accommodation of the traveling public, and to unite in the joint expense of erecting, constructing, and maintaining said union passenger depot, etc. In passing on the act the court said:

"The power of the Legislature to enact a statute of this character has been established by numerous and well-considered decisions of this and other courts of supreme jurisdiction, and is no longer open to question. *Industrial Siding Case,* 140 N. C. 239 [52 S. E. 941]; *Corporation Commission v. Railroad,* 139 N. C. 126 [51 S. E. 793], and authorities cited."

As near as we can catch the next contention, it is that as appellant, pursuant to the order, will "be compelled to enter into some sort of a contract with the Missouri, Kansas & Texas Railway Company relating to the joint use of its depot at Durant," and, as the act only provides, "in the event the railroads fail to agree, as to compensation to be paid for the construction and maintenance of the depot, the commission may fix that amount," said commission was without power to compel the Missouri, Kansas & Texas Railway Company to enter into such a contract, but, if given by the act, it would be unconstitutional on its face and constitute a taking of the property of said company without due process of law and without compensation. To this it is sufficient to say that the order is not a command to operate jointly the depot already there, but to operate a joint passenger depot on the present site of that depot, which would seem to contemplate that either a joint use of the old or the construction and maintenance of a new depot on that site would satisfy the order. That being the case, the question raised is purely hypothetical; but, should the necessity arise for a contract between appellant and the Missouri, Kansas & Texas Railway Company, relating to their joint use of the old depot, it seems, the commission being authorized by said act to make the order, there would be carried with it the power to do what is reasonably necessary to make the same effective. *Griffin v. Southern Ry. Co.,* 150 N. C. 312, 64 S. E. 16; *Haynes v. Mich., etc., Ry. Co.,* 111 U. S. 228, 4 Sup. Ct. 369, 28 L. Ed. 410; *Dewey v. Railroad,* 142 N. C. 392, 55 S. E. 292.

Assailing the order, which appellant concedes to be *prima facie* just and reasonable, it is equally untenable to insist:

"There is another point in this matter which should not be overlooked. In the complaint of the complainants it will be ob-

served they ask for a 'union' depot and the act of May 20, 1908, provides for a 'union' depot. There is nothing said in the complaint, nor is there anything said in the act of May 20, 1908, providing for a 'union passenger' depot. At the trial of this case evidence was introduced on the theory that a 'union' depot was desired, and had the plaintiff in error known that the commission was going to make an order requiring simply that a 'union passenger' depot be required at Durant, Okla., it would and could have introduced testimony to the effect that such an order would be unreasonable and unjust, in that it would entail an extra expense upon the plaintiff in error."

For the reason that we can see no injustice or unreasonableness in an order resulting in the holding of the commission after a full hearing, in effect, that, although petitioners leveled their testimony at and attempted to show the necessity of a union depot for both freight and passengers at Durant (if they did), a union passenger depot only was necessary, it cannot be said that the order is unjust or unreasonable because petitioners got less than they called for. If appellant was surprised at the action of the commission in making the order for a union passenger depot when, in effect, a union freight and passenger depot was petitioned for, because of which it was prevented from showing the order as entered to be unjust and unreasonable, "in that it would entail an extra expense upon" appellant, it should have followed the practice indicated in *St. L. & S. F. R. Co. v. Williams et al.*, 25 Okla. 662, 107 Pac. 428, by filing a motion in due time before the commission setting forth facts sufficient to show surprise, that the order as made was unjust and unreasonable, in that it had not been given sufficient opportunity to meet the issue upon which said order was entered, that it could adduce testimony to that effect if given opportunity so to do, and have asked a continuance of the hearing. Failing in this, appellant has no just ground for complaint.

But what appellant contends to be the "most oppressive result" of this order is that the $10,000 bonus subscribed by the people of Durant, payable when the work is started on its proposed depot, will be lost and never be payable unless the order is

set aside. This loss is not wholly uncompensated for. It was testified by Mr. Durant, and undisputed:

"I will state in this connection that a union depot can be maintained at less expense than you can maintain three depots. There is no railroad depot in the town of Durant that can be maintained with less than seven men. And by having a union depot it is economical for both of the roads. The Missouri, Oklahoma & Gulf proposes to build a $10,000 depot in the town of Durant. I, as a citizen of the state, don't believe there is any necessity for any such expensive depot at that town at this time. It would be a useless expense· on the part of the railroad that the public ' would have to pay for, and, unless there was some absolute necessity for it, I don't believe they ought to build it. * * * Q. Your idea is that the depot that is there affords sufficient facilities for these three roads, and that you simply desire that they use at least for the time being, until conditions possibly change in some way—the depot that is there—the three roads? A. Yes, sir; until the depot becomes inadequate, and then that question can be taken up later and passed on."

From which it appears that the loss of the bonus would only have the effect of relieving appellant of the necessity of expending it on the erection and maintenance of a superfluous structure, and put it to the inconsiderable expense of maintaining a joint force in the joint depot already there, and of paying a reasonable rent for the use of one-third thereof. In view of all the testimony, and especially that of R. P. Bowles, where, speaking to the safety of the public, he said:

"Yesterday afternoon the Flyer, what is known as the Flyer, 'Katy Flyer,' came south and No. 2 going north and the Missouri, Oklahoma & Gulf passenger train, all three of them came in at the same time. While they were there, the local freight train was on the side track switching cars back and forth on this merchandise track. Now, had the Missouri, Oklahoma & Gulf a depot where they propose to build one, the passengers coming in on either one of these other trains—it would be impossible for them to have gotten over to that had the schedule been so arranged that they would have departed as soon as these other trains got in. There was also a conglomerated mess of passenger trains there, and it would have been dangerous to have tried to have gotten to where they propose building the Missouri, Oklahoma & Gulf depot. Now, the principal business portion of the

town is on the west side of the track, and, by having the depot on that side, you avoid the track crossings, and you eliminate a whole lot of trouble there.   Quite frequently I have seen women come in there with perhaps four or five small children, and oftentimes come in there after night, and to have to go from where the depot is now to the one they propose to build would mean an exposure to trains, and it would be dangerous for them to undertake to go back and forth.   A great many people in traveling are not thoroughly up on what to do.   They feel timid in asking any one—especially women—and they will take chances quite frequently, not knowing what the danger is, rather than ask any one.   I have seen a great many incidents of this kind.   I saw one person killed because they didn't make any inquiry in trying to go across one track.   Of course, those things may never happen, and they may happen the first day.   In order to avoid that and for the future protection of our town, I believe it would be the best thing to have a union depot"

—we believe the order complained of is just and reasonable, and for that reason the same is affirmed.   See *Detroit &c. Ry. v. Osborn,* 189 U. S. 383, 23 Sup. Ct. 540, 47 L. Ed. 860; *Northern Pac. Ry. Co. v. Minn. ex rel.,* 208 U. S. 583, 28 Sup. Ct. 341, 52 L. Ed. 630; *Wisconsin &c. Ry. Co. v. Jacobson,* 179 U. S. 287, 21 Sup. Ct. 115, 45 L. Ed. 194; 8 Am. & Eng. Enc. of Law, 385; *R. R. Commissioners v. Portland &c. R. Co.,* 63 Me. 269, 18 Am. Rep. 208; *Fitchburg R. R. Co. v. Grand Junction R. &c. Co.,* 4 Allen (Mass.) 198.

DUNN, HAYES, and KANE, JJ., concur; WILLIAMS, J., not participating.