## CHICAGO, R. I. & P. RY. CO. et al. v. STATE et al.

No. 14052—Opinion Filed May 15, 1923.

Rehearing Denied July 3, 1923.

(Syllabus.)

**1. Railroads — Union Depots — Power of State to Compel Construction.**

Under and by virtue of section 26, art. 9, of the Constitution of Oklahoma and sections 3459 and 3460, Comp. Stats. 1921, the state has power and authority to require railroads to provide and maintain adequate passenger depot facilities for intrastate commerce, and when necessary may require said railroads to join in constructing and maintaining a union depot, as a proper exercise of its police power, or as a reasonable exercise of the right reserved to the Legislature to amend, alter, or repeal the charters of said railroads.

**2. Same—Police Power—Federal Statute.**

The proviso to paragraph 17, sec. 402, of the Transportation Act, 41 Stat. L. 474, which provides as follows: "Provided, however, that nothing in this act shall impair or affect the right of a state, in the exercise of its police power, to require just and reasonable freight and passenger service for intrastate business, except in so far as such requirement is inconsistent with any lawful order of the commission made under the provisions of this act"

—is plain and unambiguous, and whether construed as an independent enactment, or as a limitation restraining and limiting the sections preceding it, reserves to the state the right to exercise its police powers, to require adequate passenger depots for intrastate passenger service.

### 3. Statutes—Reasonable Construction.

Every statute should have a reasonable, sensible construction in preference to one which renders it, or a substantial part of it, useless or deleterious.

### 4. Railroads — Union Depots—Compulsory Construction — Powers of Corporation Commission—Interstate Commerce.

Under and by virtue of the proviso to paragraph 17, sec. 402, Transportation Act, the state of Oklahoma, by virtue of its Constitution and statutes, has power and authority in the exercise of its police power to require railroads engaged in intrastate and interstate commerce to provide adequate passenger depot facilities in Oklahoma City, a city of over 100,000 people, and said power was not withdrawn by the Transportation Act, but was unimpaired by the proviso to paragraph 17, sec. 402, and the orders of the Corporation Commission, as agent of the state, requiring adequate passenger depot facilities, is binding upon the railroads, except when said orders are inconsistent with some lawful order of the Interstate Commerce Commission, or when said orders amount to an unjust discrimination against interstate commerce, or amount to an unjust and unreasonable burden upon interstate commerce and would interfere with the railroads in complying with their obligations in relation to interstate commerce.

### 5. Same.

Where railroads engaged in both intrastate and interstate commerce admit their depot facilities are inadequate to accommodate the general public, and the Interstate Commerce Commission has not acted or assumed jurisdiction to require adequate depot facilities, the state may in the exercise of its police power make such orders as are necessary to insure proper and adequate depots.

### 6. Same—Order of Corporation Commission —Validity.

Record examined, and held, the finding of the Corporation Commission that adequate depot facilities in Oklahoma City require the construction and maintenance of a union depot is not clearly against the weight of the evidence, nor is said order unreasonable and unjust under the facts in the case.

### 7. Same—Location of Union Depot.

The order of the Corporation Commission, fixing the location of the depot on or adjacent to the right of way of the Santa Fe and on or adjacent to the depot of the Santa Fe, which depot is used by the Santa Fe and Frisco, and is located between one and two blocks from the present depot of the M., K. & T. Ry. and between two and three blocks from the crossing of the Santa Fe and Rock Island railroads, under the record, is neither unreasonable nor unjust.

Kennamer, Nicholson, and Cochran, JJ., dissenting.

Appeal from Order of Corporation Commission.

From orders of Corporation Commission requiring certain railway companies to construct and maintain a union passenger depot in Oklahoma City and separation of principal grade crossings, the companies affected, except the Atchison, T. & S. F. Railway Company, appeal. Affirmed.

C. O. Blake, W. R. Bleakmore, A. T. Boys, and W. F. Collins, for Chicago, R. I. & P. Railway Company.

W. F. Evans and R. A. Kleinschmidt, for St. Louis-S. F. Railway Company.

M. D. Green and H. L. Smith, for Missouri. K. & T. Railway Company.

E. S. Ratliff and Suits & Hull, for State of Oklahoma.

Geo. A. Henshaw and A. Carey Hough, for industrial shippers and traveling public.

McNEILL, J. This is an appeal from orders Nos. 2102 and 2124 of the Corporation Commission, requiring the Chicago, Rock Island & Pacific Railway Company, the St. Louis-San Francisco Railway Company, the Missouri, Kansas & Texas Railway Company, Charles E. Schaff, receiver, and the Atchison, Topeka & Santa Fe Railway Company to jointly construct and maintain a union passenger depot in Oklahoma City at a location designated by the commission, and for separation of principal grade crossings.

The proceedings originated in November, 1915, by the Corporation Commission, on its own motion, instituting an investigation regarding passenger depot facilities in Oklahoma City, which was docketed as cause No. 2386. All subsequent proceedings regarding adequate depot facilities and separation of grade crossings, upon which the orders appealed from were founded, were in that cause. The railroads, and receivers of the railroads, and all parties interested were duly notified of the proceedings. Various hearings were had, and resulted in promulgating order No. 1027, dated March 6, 1916, wherein the commission ordered the Frisco and Rock Island to join in the erection of a joint passenger station on the premises of the Frisco on Hudson street. No appeal was prosecuted to reverse this order. Plans were prepared for said joint station and submitted to, and approved by, the commission, but on account of the World War and the federal control of the railroads, with the consent of the commission, nothing further was done regarding the construction of said depot. In the meantime a movement was started in Oklahoma City by the city

planning commission for a separation of grade crossings on the principal streets and for a union depot. After the federal control ceased, and in March, 1920, the Frisco filed an application to revive order No. 1027. Upon this application numerous hearings were had, and testimony introduced on behalf of the railroads and receivers, and by the city planning commission and others interested, relating to the question of a union depot and the elimination of uptown tracks of the Frisco and Rock Island and separation of grade crossings. On September 25, 1922, the commission issued order No. 2102, denying the application of the Frisco to revive order No. 1027, and ordered that principal grade crossings be eliminated and ordered that the four railroads join in constructing and maintaining a union depot and requested the railroad companies to agree among themselves upon a location and make a report of their agreement to the commission within 60 days, and upon failure to agree upon a location, the commission itself would fix the location.

The Santa Fe and Rock Island filed a report agreeing to a location at the intersection of the Santa Fe with the Rock Island at a point between First and Second streets. Objection was made to this location by the Katy, through its receiver, and the Frisco as well as the city planning commission. The Frisco intimated a willingness to accept the location suggested by the city planning commission. No agreement having been reached by all the railroads, the commission thereafter, on December 13, 1922, promulgated order No. 2124, and fixed the location of the union station on or adjacent to the right of way of the Santa Fe and adjacent to its present depot. It was further ordered that the railroad companies file with the commission their acceptance of the location on or before the 1st of January, 1923, and file plans and specifications and estimated cost of such union passenger station with the Corporation Commission for its approval on or before the 1st day of February, 1923, and file plans, specifications, and estimated cost for all necessary tracks and other facilities essential to operation of such union station on or before the 1st of March; and that the railroads might agree as to the distribution and apportionment of the expense to be incurred and the expense and operation of the maintenance of the union station, but in case of disagreement regarding the distribution and apportionment of said cost within 90 days, then the commission should determine the expense and cost to each railroad, as deemed reasonable and proper.

From this order, appeals have been prosecuted by the M., K. & T. Ry. Co., the Rock Island, and the Frisco; the Santa Fe having failed to join in said appeal, but assuming the position that the Corporation Commission was without jurisdiction to make said order.

For reversal, it is first contended that the Corporation Commission was without jurisdiction to promulgate orders Nos. 2102 and 2124, for the reason that the Corporation Commission was without jurisdiction to require the construction or maintenance of depots or union depots, contending that the power to require the railroads to join in constructing and maintaining joint terminals has been withdrawn from the state by the act of Congress known as the Transportation Act, and the Corporation Commission never has had, and does not now have, the power to require the railroads to maintain their lines or require additional lines or trackage; or to negotiate, or deal with other railways for additional or other trackage, or require the railroad companies to appropriate additional capital to public use; that said power exists only in the Interstate Commerce Commission under the addition to the Commerce Act found in the act of Congress known as the Transportation Act, 41 U. S. Stat. at L. 474.

Prior to the passage of the Transportation Act of 1920, the power of the state, through its agency, the Corporation Commission, to require railroads to construct and maintain adequate depots, or, if necessary, union depots, was settled and established by a long line of decisions of this court, both upon the theory that the same was a proper exercise of its police power, and of the right reserved to the Legislature to amend, alter, or repeal the charters of said railroads. See section 26, art. 9, of the Constitution of Oklahoma; sections 3459 and 3460, Comp. Stat. 1921; M., K. & T. Ry. Co. v. State, 24 Okla. 331, 103 Pac. 613; St. L. & S. F. Ry. Co. v. Sutton et al., 29 Okla. 553, 119 Pac. 423; M., O. & G. Ry. Co. v. State, 29 Okla. 640, 119 Pac. 117; K. C. S. Ry. Co. v. Redwine, 43 Okla. 610, 143 Pac. 847; M., O. & G. Ry. Co v. State, 53 Okla. 341, 156 Pac. 1155; Tulsa Street Railway Co. v. Okla. Union Railway Co., 76 Okla. 102, 184 Pac. 71. For other cases upon this point, see R. R. Commission of Alabama v. Alabama Great Southern Ry Co., 183 Ala. 354, 64 South. 13, L. R. A. 1915 D. 98; State v. St. Louis & S. W. Ry. Co. of Texas (Tex.) 165 S. W. 491; Dewey v. Atlantic Coast Line Ry. (N. C.) 55 S. E. 292; St. Louis, I. M. & S. Ry. Co. v. Bellamy (Ark.) 169 S. W.

322, L. R. A. 1915 D, 91. The case of R. R. Commission of Alabama v. Alabama Great Southern Ry. Co., supra, discussed the question of acquiring additional land, and the fact that the police power of the state extends to union passenger depots.

Whether the state has been deprived of the power it once possessed involves a construction and interpretation of the Transportation Act, 41 U. S. Stat. at L. 474. The Transportation Act amended certain paragraphs of the Interstate Commerce Act. Paragraph 3 of section 400, as amended, defines the term "railroad" to include all bridges, switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of persons or property designated herein. Paragraph 15 of section 402, provides:

"Whenever the commission is of opinion that shortage of equipment, congestion of traffic, or other emergency requiring immediate action exists in any section of the country, the commission shall have, and it is hereby given authority, either upon complaint or upon its own initiative without complaint at once, if it so orders, without answer or other formal pleading, by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the commission may determine * * * (c) to require such joint or common use of terminals, including mainline track or tracks for a reasonable distance outside of such terminals, as in its opinion will best meet the emergency and serve the public interest, and upon such terms as between the carriers as they may agree upon, or, in the event of their disagreement, as the commission may after subsequent hearings find to be just and reasonable."

Paragraph 17 provides:

"The directions of the commission as to car service and to the matters referred in paragraphs (15) and (16) may be made through and by such agents or agencies as the commission shall designate and appoint for that purpose."

Said section provides for compliance with its orders, and fixes a penalty for refusal, and then contains the following proviso:

"Provided, however, that nothing in this act shall impair or affect the right of a state, in the exercise of its police power, to require just and reasonable freight and passenger service for intrastate business, except in so far as such requirement is inconsistent with any lawful order of the commission made under the provisions of this act."

This proviso in plain and unambiguous language provides that nothing in the act shall

impair the right of the state in the exercise of its police power to require just and reasonable freight and passenger service for intrastate business. It will not be contended that just and reasonable passenger service does not include adequate depot facilities. If we admit that the Transportation Act, without the proviso, is subject to a construction that the state was deprived of the right to exercise its police power for the purpose of requiring just and reasonable freight and passenger service, what force and effect is to be given to the proviso? This court in the case of Hudson v. Hopkins, 75 Okla. 260, 183 Pac. 507, in reviewing the previous decisions of this court, stated as follows:

"2. The natural and appropriate office of a proviso being to restrain or qualify some preceding matter, it should be confined to what precedes it, unless it clearly appears to have been intended to apply to some other matter.

"3. A proviso to a section of the statute should be construed with the section of which it forms a part, and, if the context requires it, may be considered tantamount to an independent enactment."

See, also, U. S. v. Babbit, 1 Black, 55, 17 L. Ed. 94. If the proviso is considered an independent enactment, or if it is confined to what precedes it, and restrains and qualifies the preceding matter, in either case it would have the force and effect of leaving the rights of the state unimpaired. If we give force and effect to the proviso, which in plain and unambiguous language reserved to the state the right to exercise its police powers for the purpose of requiring just and reasonable freight and passenger service for intrastate business, the state has not been deprived of the right to exercise its police power in proper cases, except in so far as such requirement is inconsistent with any lawful order of the commission made under the provisions of this act.

Let us apply the act as we construe it to the facts in the case at bar. The Rock Island Railroad Company admits its depot facilities are inadequate to properly serve the public interests. The Frisco Railway Company has no depot facilities, and is a tenant of the Santa Fe, and the depot facilities of the Santa Fe are inadequate. Mr. Hamilton, vice president of the Frisco, testifies as follows:

"At the last hearing, the latter part of May, I stated to the commission briefly on behalf of our company that the prime object we have in mind was to get an adequate

passenger terminal in Oklahoma City. We have some 1,500 miles of railroad in this state. In fact, we have the major or larger mileage than in any other carrier in Oklahoma. We bring a large number of passengers from the state into Oklahoma City every day and a large number out, running seven trains in and seven out on our daily schedule. People in the state coming in here or leaving here on our trains have been subject for a number of years to very great inconvenience. We have been tenants of the Santa Fe as to passenger facilities for some years. The crowded condition of that terminal and inconvenience to the traveling public, I think, is known to all of us here and needs no enlargement from me. The Santa Fe has done, as I said before, with what they have got, but they have not got enough room for us. We have gone along patiently for a long time in the hope that something would be worked out to better our condition. I think the record shows we have endeavored to co-operate with the city planning commission. Our chief engineer, Colonel Jonah, who has just testified, attended, at their request, a number of their hearings and gave them the benefit of his advice. We have waited for a long time with our hands folded waiting. We said at the last hearing we were not opposed to the union station idea if any prospect of getting the relief we needed for our patrons, not only in Oklahoma City but over the state, in a reasonable time, within a generation or two. I want to say to the commission this morning that on account of our doubts of getting anywhere with a union station, to say frankly, we oppose that plan and express the wish that the commission will give us permission to erect the station on our site. We feel we have reached the limit. The complaints that reach our passenger department from patrons who come in and go out are such that it is no longer our duty to wait for the dream of any public body. We ask permission of the commission to withdraw our announcement of willingness to go into a union station and ask to go ahead with the erection of our own station. We are prepared just the minute the commission OK's our plan to immediately spend the money. No strings attached to that. We mean business. All we want is authority from the commission. We are ready to go to bat and dig dirt. We are ready to finance the proposition immediately and we believe this is an auspicious time to begin construction because of cost of material and our need of terminal passenger facilities."

In regard to the Katy, the commission found as follows:

"The record shows the station of the Katy to be adequate in size for the needs of that road and its tenant, the Ft. Smith & Western, but that it is located in the heart of the wholesale and industrial section of the city; that pedestrians or others must cross the yards of the Santa Fe in reaching this station, and suggests that the locality is not safe for the public at night, nor for women and children at any time."

The commission found the depot of the Santa Fe inadequate, and it has failed to appeal.

It will be conceded that all four railroad companies are engaged in intrastate and interstate business. The findings and admissions are that the depot facilities are inadequate to accommodate the public needs in so far as intrastate business is concerned. The state by its orders has found that the best and most economical manner of insuring adequate depot service is for all the roads to construct a union depot, and orders and requires the roads to build and construct the same. The roads being unable to agree upon a location, the Corporation Commission itself located the depot. Under this state of the record, if we give any force and effect to the proviso to the Transportation Act, there can only be one logical conclusion reached, and that is, the state has power and authority to require the railroads to provide adequate depot facilities to insure reasonable passenger service. To hold otherwise would be to hold that Congress, in enacting the proviso, used plain and unambiguous language in expressing its purpose and intent, but the court will construe this proviso as useless or deleterious, which is contrary to the rule in construing statutes. See Harris v. Bell, 250 Fed. 209.

It is contended, however, by the plaintiffs in error that the Supreme Court of the United States, in the case of R. R. Commission of Wis. v. C., B. & Q. Ry. (Advance Sheets) 66 L. Ed. 236, held to the contrary, and announces the rule that the Transportation Act has deprived the state of all its power and authority over intrastate freight rates and passenger service. We do not think the case is subject to the interpretation placed upon it by the plaintiffs in error. The statement of facts in that case is about as follows:

The state of Wisconsin by statute had prescribed a maximum fare for passengers of two cents per mile, and fixed intrastate freight rates. The Interstate Commerce Commission began an investigation, as provided under the act of the Interstate Commerce Commission, into alleged undue and unreasonable discrimination against interstate commerce arising out of intrastate railroad rates in Wisconsin. The railroads, the Governor, and State Railroad Commission

were duly notified. The Interstate Commerce Commission had previously investigated interstate rates of carriers in the United States, and ordered an increase of 35 per cent. on interstate freight rates, and 20 per cent. on interstate passenger fares. The Interstate Commerce Commission ordered the increase on all interstate rates as provided above. The railroads applied to the Wisconsin Railroad Commission for corresponding increase in intrastate rates. The Wisconsin Railroad Commission granted the increase on intrastate freight rates, but denied the increase on passenger fares on the ground that the state statute prescribed a maximum for passengers of two cents per mile. The Interstate Commerce Commission had found there was an undue, unreasonable, and unjust discrimination in Wisconsin against interstate passengers and against interstate commerce as a whole, and ordered that the undue discrimination should be removed by an increase in all intrastate passenger fares and freight rates. The order was made by the Interstate Commerce Commission without prejudice to the right or authority of the state to apply to the commission for a modification of the order as to any specified rate, if the latter was not related to the interstate fare or charge in such a way as to contravene the Interstate Commerce Act. The carriers then filed a bill in equity to enjoin the Railroad Commission and the state officials from interfering with the maintenance of the passenger fares ordered by the Interstate Commerce Commission. The opinion stated the question involved as follows:

"We have two questions to decide:

"First. Do the intrastate passenger fares work undue prejudice against persons in interstate commerce, such as to justify a horizontal increase of them all?

"Second.. Are these intrastate fares an undue discrimination against interstate commerce as a whole which it is the duty of the commission to remove?"

It will thus be seen the questions involved in that case were very different from the ones involved in the case at bar. In that case, the court found that the rates prescribed by the Railroad Commission of the state of Wisconsin, which were fixed by the state in the exercise of its police power, were inconsistent with the lawful order made by the Interstate Commerce Commission regarding passenger fares, and amounted to an unjust discrimination against interstate commerce as a whole. No such questions are presented in the case at bar.

In discussing the question of whether the Transportation Act gave the Interstate Commerce Commission unified control of interstate and intrastate commerce, the court stated as follows:

"It is said that our conclusion gives the Interstate Commerce Commission unified control of interstate and intrastate commerce. It is only unified to the extent of maintaining efficient regulation of interstate. commerce under the paramount power of Congress. It does not involve general regulation of intrastate commerce. Action of the Interstate Commerce Commission in this regard should be directed to substantial disparity which operates as a real discrimination against, and obstruction to, interstate commerce, and must leave appropriate discretion to the state authorities to deal with intrastate rates as between themselves on the general level which the Interstate Commerce Commission has found to be fair to interstate commerce."

This language is not subject to the interpretation placed upon it by the plaintiffs in error, to wit: That the power of the state to deal with intrastate freight rates and passenger service, in the exercise of its police power, has been withdrawn, but, as stated in the opinion,

"An action of the Interstate Commerce Commission * * * should be directed to substantial disparity which operates as a real discrimination against, and obstruction to, interstate commerce."

The case at bar does not involve freight rates, but has to do only with requiring adequate passenger depot facilities. The opinion of the U. S. Court, supra, supports the proposition that the state has a right, in the exercise of its police power, to deal with intrastate passenger service, and authority to require adequate depot facilities for intrastate passengers, so long as its orders do not discriminate against the interstate commerce and prevent the railroad company from fulfilling their obligation to the interstate commerce, and its orders must be fair to interstate commerce. Again the court stated:

"So, too, in practice. when the state commission, shall recognize their obligation to maintain a proportionate and equitable share of the income of the carriers from intrastate rates, conference between the Interstate Commerce Commission and the state commissions may dispense with the necessity for any rigid federal order as to the intrastate rates, and leave to the state commission power to deal with them and increase them or reduce them in their discretion."

In referring to the provisions of the new commerce act, Justice Taft stated the new

measure imposes affirmative duties on the Interstate Commerce Commission to fix rates and to take other important steps to maintain an adequate railroad service for the people of the United States. This is expressly declared in paragraph 15a to be one of the purposes of the bill. Can it be said that an order requiring adequate depot facilities is a discrimination or obstruction to interstate commerce, or is unfair to interstate commerce, when the railroads have complied neither with the provisions of the Transportation Act, by furnishing adequate service to interstate commerce, nor with its duties to the state regarding intrastate business, by affording adequate depot facilities? Can it be said that the state has no power or authority to require adequate service when that is guaranteed to it by the Transportation Act, and the railroad companies admit their depot facilities are inadequate? Adequate service for intrastate passengers guarantees, to the interstate passengers the same adequate service without discrimination. That the Transportation Act did not deprive the state of its police power and authority to regulate intrastate freight and passenger service, is also supported by the consolidated cases of State of Texas v. Eastern & Texas R. Co. and State of Texas v. U. S., 66 Law Ed. (Advance Sheet) 313. The facts in those cases are substantially as follows:

The Eastern Texas R. Company owned and operated a line of railroad 30 miles in length in the state of Texas. Approximately three-fourths of the traffic over the road was interstate and foreign commerce, and the rest was intrastate commerce. The company owned or operated no other line of railroad. On June 3, 1920, the company filed with the Interstate Commerce Commission an application for a certificate authorizing it to abandon and cease operation of its road. Notice was regularly given; the state of Texas declined to appear before the Interstate Commerce Commission, but others who were being served by the road appeared and opposed the application. The commission made findings of facts and granted a certificate for permission to abandon the road. The state brought a suit in one of the courts of the state against the railroad company and its officers to enjoin them from ceasing to operate the road in so far as intrastate commerce was concerned. The suit was brought on the theory that under the laws of the state the company was required to continue the operation of the road for interstate commerce; that the provisions of the Transportation Act were unconstitutional and void, if, and in so far as, they authorized the abandonment of the road as to intrastate commerce, and that the company, in asking the commission to sanction such an abandonment, was proceeding in disregard of its obligations to the state. The suit was removed to the District Court of the United States for the Western District of Texas. The U. S. District Court held that the certificate of the Interstate Commerce Commission authorizing the abandonment of the road constituted a complete defense on behalf of the railroad company and, without a hearing on the issues, dismissed the suit. From that order an appeal was taken.

After the commission granted the certificate, the state brought a suit in the District Court of the United States for the Eastern District of Texas against the United States, the railroad company, and others, to set aside and annul the order and certificate of abandonment on the grounds that the provisions of the Transportation Act did not afford any basis for granting a certificate sanctioning the abandonment of the company's road as respects intrastate commerce, and, if those provisions of the act authorized such a certificate, they were, to that extent, in excess of the power of Congress, and an encroachment on the reserved powers of the state. The United States and the railroad company moved to dismiss the bill as ill-founded in point of merit, and the court sustained the motions and entered a decree of dismissal. The state appealed from this order.

It was not contended in those cases that the Interstate Commerce Commission did not have authority to sanction a discontinuance of the road in so far as it related to interstate and foreign business, but it was contended by the state that that right did not extend to intrastate business. The court used this language:

"Interstate and foreign commerce will not be burdened or affected by any shortage in the earnings (of the railroad) nor will any carrier in such commerce have to bear or make good the shortage. It is not as if the road were a branch or extension whose unremunerative operation would or might burden or cripple the main line, and thereby affect its utility or service as an artery of interstate and foreign commerce."

It was also suggested in the opinion that if the Transportation Act sought to authorize the Interstate Commerce Commission to deal with the abandonment of such a road as to intrastate as well as interstate and

foreign commerce, a serious question of its constitutional validity will be unavoidable. But if given a more restricted construction, its validity will be undoubted. In the body of the opinion the court used the following language:

"As a whole, these acts show that what is intended is to regulate interstate and foreign commerce, and to affect intrastate commerce only as that may be incidental to the effective regulation and protection of commerce of the other class. They contain many manifestations of a continuing purpose to refrain from any regulation of intrastate commerce, save such as is involved in the rightful exertion of the power of Congress over interstate and foreign commerce. Minnesota Rate Cases, 230 U. S. 352, 418, 57 L. Ed. 1511, 1549, 48 L. R. A. (N. S.) 1151, 33 Sup. Ct. Rep. 729, Ann. Cas. 1916 A, 18; Railroad Commission v. Chicago, B. & Q. R. Co. (U. S.) ante, 236, 42 Sup. Ct. Rep. 232. And had there been a purpose here to depart from the accustomed path, and to deal with intrastate commerce as such, independently of any effect on interstate and foreign commerce, it is but reasonable to believe that that purpose would have been very plainly declared. This was not done."

As we construe these two opinions and interpret the same, they support the principle that the right of a state through its police power to require just and reasonable freight and passenger service for intrastate business is unimpaired by the Transportation Act, so long as its orders do not discriminate against interstate or foreign commerce, and so long as the enforcement of those orders does not place an unusual burden upon interstate and foreign business.

Let us see the position the railroads are forced to take in this case. The Frisco is a tenant of the Santa Fe. It admits the depot service is inadequate, and this applies to intrastate and interstate passenger service. It desires the Corporation Commission to make an order authorizing it and the Rock Island to build a union station at another point. In other words, it takes the position that the Corporation Commission has power and authority to require the construction of a union station for the Frisco and Rock Island at a certain location, but has no power and authority to require a union station to be constructed at the point designated and joined in by four railroads instead of two. The question of whether the construction of this depot will. place an unusual burden on the company, so as to cripple its operation upon interstate or foreign commerce, cannot be determined until after the plans and specifications are made and approved, and the distribution of the

costs made. In regard to the location of the station, it agreed to accept the location.

Let us consider the question in so far as the Rock Island is concerned. The Rock Island admits its depot facilities are inadequate. It desires permission from the state Corporation Commission to build and construct another depot. It is willing that an order be made requiring it to join with the Frisco in constructing a union station. It, too, assumes the position that the Corporation Commission has power and authority to require it to join with the Frisco in building a union station on the grounds of the Frisco, but has not the power and authority to require it to join with the Frisco, Santa Fe and Katy. This position, in our judgment, cannot be sound. If the Corporation Commission of the state has no power or authority to require adequate depot facilities, upon what theory has it power and authority to order the Frisco and Rock Island to construct a union depot? The location of the union depot as fixed by the commission is some two or three blocks from the place where the Rock Island and Santa Fe agreed upon as a good location for such a depot. There is some evidence that the Rock Island owns property extending to or almost to the place of the location fixed by the Corporation Commission.

As to the M., K. & T. Ry., the commission found that the size of the Katy depot for the needs of that road and its tenant, the Ft. Smith & Western, was adequate, but it was located in the heart of the wholesale and industrial section, and pedestrians must cross the tracks of the Santa Fe, and the location is not safe for the public at night, nor for women and children at any time. The record also disclosed that the location made by the commission for the union depot is within a block, or a little more, from the present location of the Katy depot, and there is some evidence that the Katy owns almost sufficient property to extend its line to the new location. We think the right of the state to require adequate intrastate freight and passenger service is not denied by the Transportation Act, so long as the orders requiring the same do not amount to an undue discrimination against interstate and foreign commerce, and thereby place an unusual burden upon interstate and foreign commerce, and that said right extends to requiring adequate depot facilities.

Plaintiffs in error further cite the case of A., T. & S. F. Ry. Co. v. Railroad Commission (Cal.) 211 Pac. 460. The Supreme Court of California, in the case before it

dealt with the same solely upon the proposition that the Interstate Commerce Commission had exclusive right to require adequate depot facilities. The court in that opinion did not recognize nor refer to the proviso to paragraph 17, nor did the court refer to the case of State of Texas v. Eastern Texas Ry. Co. The Chief Justice in that case went to the extent in his concurring opinion, of announcing that in his judgment neither the Railroad Commission of California nor the Interstate Commerce Commission had power or authority to require the railroad to construct depot and tracks necessary therefor, because the same was equivalent to ordering them to dedicate new property to public use. It may be that the facts in that case justify the holding of the Supreme Court of California, but that court's construction of the Transportation Act is not binding upon this court, and in our judgment the court in that case placed the same construction on the Transportation Act as the Eastern and Western United States District Courts of Texas did in the case of State of Texas v. Eastern Tex. Ry. Co., supra, which construction was held erroneous by the Supreme Court of the United States.

The case of Peoples ex rel. New York Cent. R. Co. v. Public Service Commission of New York (N. Y.) 135 N. E. 195, is also cited. That case involves the authority of the Public Service Commission of New York to require two railway companies to build a connecting track. The question in that case was not identical with the one at bar, but involved paragraph 13 of section 402 of the Transportation Act, and did not refer to the proviso.

The defendant in error, to support the judgment of the commission, refers to the history of the Transportation Act to support the theory that it was not intended by Congress to interfere with the state in the exercise of its police power. As was said in the case of R. R. Commission v. C., B. & Q., supra:

"Committee reports and explanatory statements of members of Congress in charge, made in presenting a bill for passage, while a legitimate aid to the interpretation of a statute when its language is doubtful or obscure, cannot control such interpretation when, taking the act as a whole, the effect of the language used is clear to the court. Such aids are only admissible to solve doubt, and not to create it."

The proviso of the act of Congress is plain and unambiguous, and it is unnecessary for the court to seek aid in interpreting plain and unambiguous language.

In the case of R. R. Commission v. C., B. & Q., supra, in referring to whether the Interstate Commerce Commission had unified control over all commerce, the court stated:

"It is only unified to the extent of maintaining efficient regulation of interstate commerce under the paramount power of Congress. It does not involve general regulation of intrastate commerce."

There is another principle of law applicable to the facts in the case at bar, which is announced in the case of Missouri Pacific Railway Co. v. Larabee Flour Mills Co., 211 U. S. 612, where the court stated, in substance: Notwithstanding the creation of the Interstate Commerce Commission and its control over certain matters, a state may, in the absence of express action by Congress or by such commission, regulate for the benefit of its citizens local matters indirectly affecting interstate commerce. And further stated: Where there has been no action by the Interstate Commerce Commission, the state may compel a railroad company doing interstate business to afford equal local switching service to its shippers. If we apply that rule to the facts here as follows: Neither Congress nor the Interstate Commerce Commission has acted to remedy the inadequate passenger service; although it may indirectly affect interstate commerce, the state has a right to make proper orders to secure adequate service to its citizens, so long as the same are not inconsistent with the orders of Interstate Commerce Commission or discriminatory as heretofore announced.

It is next contended by some of the roads that the order is unreasonable and unjust. What we have said about the facts heretofore answers the question of the reasonableness of the order. The evidence of the railroad companies is sufficient to support a finding that a union station is necessary, and nothing appears in the record as to why the same cannot be maintained as economically as separate depots, or showing it is unreasonable. There is nothing in the evidence regarding the location that makes the same unjust or unreasonable. What the depot will cost has not yet been determined. The order gives the railroad companies the opportunity to prepare plans and specifications; such, of course, as will provide adequate service, as contemplated under the Transportation Act for adequate railroad service, and which will insure to the state adequate service for its intrastate business.

In doing this, the railroad companies can, and the commission no doubt will, take into consideration, not only what may be adequate facilities for the present, but take into consideration the natural growth of the city, and the increase of their intrastate business. The order as it now stands is not unreasonable.

In regard to the elimination of the grade crossings, there is no question raised by any of the railroads except the M., K. & T., and it is doubtful whether the order requires any elimination of grade crossings of the M., K. & T. So far as the M., K. & T. is concerned, that question will not be decided, unless some controversy arises over the same in the future. It appears from the 7th finding of fact that the elimination of grade crossings only applied to the Frisco, Rock Island, and Santa Fe, and they do not contest that part of the order.

For the reasons stated, the judgment of the commission is affirmed.

JOHNSON, C. J., and KANE, HARRISON, and MASON, JJ., concur; KENNAMER, NICHOLSON, and COCHRAN, JJ., dissent.