THE RAILROAD COMMISSIONERS, Petitioners,

*vs.*

THE PORTLAND AND OXFORD CENTRAL RAILROAD COMPANY.

*Constitutional law. Mandamus. Railroads. P. & O. C. R. R. charter. Act
of 1871, c. 204.*

Railroads are public highways, and are to be conducted in furtherance of
the public objects of their creation.

It is not within the discretion of the directors of a railroad company ulti-
mately and conclusively to determine the manner in which the corporation
shall discharge the public duties enjoined upon it by its charter; that power
and duty are devolved upon the state tribunals.

The writ of *mandamus* lies to compel a railroad company to perform the pub-
lic duties imposed upon it by its charter.

Railroad charters are to receive such a construction as is reasonable and con-
sistent with the public objects to be subserved by them.

The requirement in the eighth section of the charter of the Portland and Ox-
ford Central Railroad Company, (Special Laws of 1857, c. 122,) that "the
corporation shall be obliged to receive at all proper times and places and
convey persons and articles" means that "the times and places" designated
for the purposes named shall in fact be reasonable, consistent with and in
aid of the right of the public to use the road.

Whether or not the times and places established by the corporation are of
this description is ultimately to be determined by the state tribunals.

R. R. Commissioners *v.* P. and O. C. R. R. Co.

The Public Laws of 1871, c. 204, empowering the railroad commissioners to direct a railroad corporation to erect and maintain a depot at a specified place on the line of its road, determined by them to be proper and in accordance with the demands of public convenience and necessity, is constitutional, and not inconsistent with, nor an infringement upon, the charter of the Portland and Oxford Central Railroad Company.

The law under which the railroad commissioners located the station at Hartford Centre, on the defendant's railroad, being constitutional, and not in violation of the contract created between the State and the corporation by its charter, but in strict conformity therewith; and being a proper regulation of the public use of the road; the action of the railroad commissioners is, therefore, affirmed, and the corporation is directed to conform thereto.

On exceptions.

Daniel Parsons and other, responsible citizens of Hartford, in this county, on the fifteenth day of May, 1871, applied to the railroad commissioners of this State, agreeably to the provisions of the Public Laws of that year, c. 204, representing that public convenience and necessity required that a depot be established at Hartford Centre, upon the line of the Portland and Oxford Central Railroad. A hearing was had upon this petition on the thirteenth day of June, 1871, and the commissioners determined that the prayer thereof should be granted, and ordered the construction of a building particularly described by them, in a place by them designated, to be erected within thirty days after service of said order upon the president of said corporation, which was made on the twenty-ninth day of June, 1871. The company refused compliance with this order, which also directed the payment of the commissioners' fees, ($150,) and the other costs of the hearing, taxed at $34.63, whereupon the railroad commissioners, in their official capacity, in behalf of the State, present the present petition to this court, setting forth both these facts, and praying appropriate action thereon.

The defendants appeared by their president and claimed that the statute under which the aforesaid proceedings were had, Public Laws of 1871, c. 204, was unconstitutional, and an infringement of the defendants' charter, (Special Laws of 1857, c. 122, § 8) violating the obligation of the contract thereby created between the State and the corporators. He also asserted that the opinion and

judgment of the railroad commissioners was against the evidence and the weight of evidence, and that public convenience and necessity did not require the erection of a depot at the locality in Hartford indicated by them.

The justice holding the *nisi prius* term at which the petition was presented ruled *pro forma* that the respondent's answer was insufficient, and ordered that the prayer of the petitioners be granted as ordered by the railroad commissioners, it being agreed that, if the ruling were sustained, the court were also to determine whether or not the respondents were entitled to a hearing before this court as to the question of the necessity and convenience of the depot ordered at the spot designed. The respondents excepted.

*F. O. J. Smith* and *Geo. D. Bisbee*, for the respondents, presented no brief, relying upon *State* v. *Noyes*, 47 Maine, 189.

*Samuel H. Blake*, for the railroad commissioners, petitioners.

The railroad commissioners on the thirteenth of June, 1871, ordered a depot to be made at Hartford Centre, where there had always been one until it was sold and removed a short time before. The commissioners acted under Public Laws of 1871, c. 204. Both parties appeared, introduced witnesses and argued the case upon its merits.

If the act of 1871 changed the defendants' charter, this was within legislative authorization; the charter being granted subsequently to March 17, 1831. R. S., c. 46, § 17.

A general law like that of 1871, c. 204, does amend all existing charters, although the particular corporations holding them are not named and the charters become as if this were incorporated into them. *Roxbury* v. *B. & P. R. R. Co.*, 6 Cush., 424, 432.

The order of the commissioners was within the charter, as thus amended.

The Buckfield Branch Railroad charter, granted July 22, 1847, Special Laws of that year, c. 54, § 9, provided that the road shall "be obliged to receive at all proper times and places and convey" . . . . freight and passengers.

And the Portland and Oxford Central Railroad Company, into which the first was merged, was chartered April 15, 1857. Special Laws of 1857, c. 122.

Section 8 of this charter has the same provision as to times and places of receiving passengers and freight.

And now the corporation and the public differ as to the "proper times and places," and the legislature, by this act of 1871, merely created a tribunal, or authorized one already existing, to hear both sides, and decide whether this was a "proper place." Just as in the case of any existing right, it confers jurisdiction of it upon such tribunal as it pleases, without impairing or increasing the right; or directs the mode of proceeding, by an action of assumpsit or case, or changes the kind of action to try and decide the right.

Besides, this charter of 1857, § 11, reserves in so many words the right to the legislature at all times "to correct and prevent all abuses of the same."

The act of 1871 is the mode the legislature adopted to "correct" the abuse of the charter in this respect. It does not "impose any other or further duties;" it only provides a way in which the discharge of old duties should be enforced.

Nor is the act of 1871, an "altering" of the charter within the prohibition of the closing paragraph of § 11; it is only an amendment under R. S., c. 46, § 17, at most; and a mode the legislature adopted to "inquire into the doings of the corporation," and the action it adopted "to correct and prevent all abuses" of chartered privileges. It is not an "alteration" within meaning of the closing sentence of § 11 of the charter, because it only provides the remedy for neglect of a duty already imposed. And there is no "express limitation" in this closing paragraph upon the mode and means the legislature might see fit to adopt to enforce the duty required of the corporation by § 8, "to receive passengers and freight at all proper times and places."

Again, although a railroad may be a private corporation, it is peculiar in this, that it is for public uses. The legislature has

never parted with the right to regulate the public uses of railroads. It is the duty of the State to take care of the public convenience and necessities of its citizens, and it cannot divest itself of the jurisdiction to do so, if it would, by any law or charter. The legislature has jurisdiction to the extent of the "public uses" over all corporations by the very law of the self-preservation of the State.

The legislature might adopt any mode of regulating "public uses" not in conflict with the constitution; but the mode prescribed by the act of 1871 is not in conflict with the constitution, or even with the charter of this road. Section 11 of the charter is silent as to how the "proper places" named in § 8, shall be enforced. Nor has the road any further right to a hearing upon the merits.

The "hearing" provided for by R. S., c. 51, § 75, is a hearing "thereon" that is upon the "petition" of the commissioners to the court—and this petition is "to enforce compliance as provided by said § 75"—(see § 3, act of 1871) and has no other purpose—and hence it excludes a hearing upon the original question of necessity and convenience, —that had been passed upon and decided under act of 1871, without any provision for appeal. Nor can it reasonably be said the legislature intended an appeal from the railroad commisioners to the supreme judicial court upon the local question of the necessity for a depot. Section 75 was for an entirely different purpose, viz : for repair of roads—but it is appealed to here by act of 1871, for the single purpose of enforcing compliance with the order of the commissioners—not of reviewing merits of their decision.

*State* v. *Noyes*, 47 Maine 189, differs from this among other things, because there,

I. The legislative department of the government assumed judicial functions. Here, the legislature provides a tribunal to hear and decide, as in other cases of disputed duties or rights.

II. That case was to promote individual convenience; this, to answer the demand of public convenience and necessity.

III. That statute interfered with the running of trains—as to time—without pretence of abuse of franchise; this establishes a

mode to enquire whether there has been an abuse of the franchise, and a means of remedying any abuse so found. The statute becomes operative only in case of neglect by the corporation "to receive passengers at proper places," which would be an abuse of the franchise; and if the corporation do not neglect so to receive, there is no authorization for the commissioners to interfere. There is no new duty imposed thereby; nor can there be any action under the statute except upon assumption of an abuse of its power by the corporation.

IV. That statute interfered with the rules and regulations of their charter, § 6, established by the directors; this meddles with no regulations of any company, but only enforces a duty the charter required the company to perform.

This act of 1871 is no more than every day's legislation attempts—that is, to compel persons to perform their duties. It requires the company to keep and perform the obligations of the charter, by which it exists, and imposes nothing more upon it.

Suppose that the legislature should grant a charter to a railroad company across the State, in consideration of its public uses, (as is the inducement in all cases) and the corporation thus established neglects to establish any depot between Vanceboro and Kittery, and refuses to receive passengers or freight anywhere between these two points. (Yet the charter might be just like this): This would be an abuse of its chartered privileges; a disregard of the "public uses," that were the inducement to its creation—and the mere statement, it seems to me, carries with it a refutation of the hypothesis of the defendant corporation. I submit that State sovereignty should dominate over corporate sovereignty, and the public be placed in the enjoyment of those "uses" to which they are entitled as the consideration for the charter.

DICKERSON, J. In pursuance of the authority conferred on them by chapter 204 of the Public Laws of 1871, the railroad commissioners, upon petition therefor and a hearing thereon, decided that public convenience and necessity required the erection

R. R. Commissioners v. P. and O. C. R. R. Co.

and maintenance of a depot for freight and passengers upon the Portland and Oxford Central Railroad, at Hartford Centre, and ordered the corporation to build such depot within thirty days from the receipt of the order. The corporation refused to comply with the order, and the railroad commissioners filed this petition, praying that this court will enforce a compliance therewith.

The duty of governments to provide facilities for public travel and transportation at the public expense, by means of roads, turnpikes, canals and other artificial structures, has been recognized and discharged by all civilized governments from the earliest times. Governments soon learned that such facilities could not be provided by private enterprise alone, and that nothing but the exercise of the right of eminent domain and the power of taxation could satisfy the public necessities in this behalf. In the progress of events, however, as business and population increased, and wealth accumulated, it was found that this function of government might in many cases, be conveniently and safely performed by private individuals, associated together under a grant from the government, the corporation giving the public the right to use the highway built by it, in consideration for the franchise received.

Among the instrumentalities thus employed railroads stand pre-eminent. Indeed, they have come to be a public necessity scarcely exceeded by the public wants that evoked those ruder means of transit in earlier times. They are open for the public use without discrimination. To the State's guaranty of the right of public use are superadded heavy pecuniary liabilities of the corporation in case of a breach of this right. The requirement for the payment of fare does not, by any means, conflict with the right of public use. The fare is the consideration for the service performed, whether done by the State directly, or by a corporation under a grant from the State; it is simply a substitute for the tax rendered necessary when the State builds and conducts railroads at the public expense; the corporation, upon the payment of the fare, is under the same obligation to render the re-

quired service for the public, that the State would be, if railroads were free, and conducted by State authority. Nor does the ownership of railroads, whether it be in the State or a private corporation, affect the nature of their use, since in either case the function to be exercised and the uses to be subserved are public. Neither does it make any difference in this respect that private individuals cannot use their own rolling stock upon railroads. The use is one thing, and the mode of use, is another. The use, being public, does not become private from the mode of use; that is exclusively within the discretion of the legislature, and whether the railroad corporation, the public, or the State have authority under the charter to put on and use rolling stock, the use of the road is nevertheless public.

The public character of railroads further appears from the authority granted to them to exercise the right of eminent domain. No such right is ever granted to banking, manufacturing or insurance corporations, or to academies, colleges, or hospitals established and conducted by private individuals, or private corporations. It is solely because the use of railroads is public that this distinction is made. So, too, upon the same ground of public use, the legislature may authorize municipal corporations to aid in building railroads, by taking stock in railroad corporations; and paying for the same by municipal taxation, a power denied to all municipalities in respect to purely private corporations.

The conclusion, therefore is, that railroads, whether built, owned and conducted by the State or private corporations, and whether exacting tolls, or free, are public highways. *Olcott* v. *Supervisors of Fond Du Lac*, 16 Wallace, 678; *Belfast & Moosehead Lake R. R. Company* v. *Brooks*, 60 Maine, 569; *Allen* v. *Jay*, 60 Maine, 124.

In considering the right of the public to the use of railroads, and the public interest resulting from this right, it should not be overlooked that the payment of fares is more than compensated, in general, by the reduced expense of travel and transportation by this mode over other means of conveyance, in addition to the

other advantages, public, private and local, resulting from the establishment of railroads. This is obvious from railroads so soon superseding the previously existing modes of intercommunication. This beneficial public interest is intended, among others, to be secured under the franchise granted to railroad corporations; and the public have an interest that this result should be attained and maintained by them.

In the circumstances of their origin, and in their powers, uses and duties railroad corporations are clearly distinguishable from other merely private corporations; and, unless we keep these characteristics in view when we come to determine the rights, powers and duties of such corporations, and the authority, express, implied or reserved, of the legislature and court in respect to them, we shall run the hazard of confounding dissimilar distinctions and committing grave errors. What analogy, it may be asked, do manufacturing, mining and other like corporations, evoked by no public necessity, exercising no sovereign powers, subserving no public uses, and subject to no public duties, bear to railroad corporations that both should alike have the same legal status? Do not these distinguishing characteristics make railroad corporations *quasi* public corporations in respect to the authority of the court and legislature to determine and enforce the public duties enjoined upon them? If not, what redress have the public for a neglect, infringement or violation of those duties?

The recent decisions of this court affirming the constitutional power of the legislature to authorize municipal corporations to aid in the construction of railroads, and denying its power to authorize such corporations to aid manufacturing and other purely private corporations or parties, and, also, those requiring railroad corporations to protect the passengers on their road, and making them liable for the negligence and misconduct of their servants in this behalf, as well as that further decision prohibiting railroad corporations from making injurious discriminations with respect to the persons or corporations entitled to do business over their road or the business to be done thereon, enunciate principles of great im-

portance for determining the various questions, not unlikely to arise in respect to the relations subsisting between railroad corporations and the public, the powers granted and the public duties enjoined under their charters, and the constitutional authority of the court and legislature concerning them. These decisions, it is believed, lay the foundation for a harmonious superstructure of judicial authority, upon a subject replete with apparent intricacies and antagonisms. While the law affords railroad corporations adequate and complete protection in the exercise of their chartered rights, it also holds them to a strict performance of the public duties enjoined upon them as a consideration for the rights and powers thus granted. In cases of apparent conflict between the rights and powers conferred and the duties imposed, the solution may oftentimes be rendered easy by regarding the admitted right of public use as the touchstone of judicial interpretation. *Belfast & Moosehead Lake R. R. Co.* v. *Inhabitants of Brooks*, ante; *Allen* v. *Jay*, 60 Maine, 124. *Goddard* v. *Grand Trunk Railway Co.*, 57 Maine, 202. *N. E. Express Company* v. *M. C. R. R. Co.*, 57 Maine, 194.

Railroad charters are contracts made by the legislature in behalf of every person interested in anything to be done under them. In consideration of the franchise they receive from the State, railroad corporations agree to perform certain duties toward the public. The power of determining those duties, and enforcing their performance is vested in the appropriate tribunals of the State. Without such power, there would be danger that railroad corporations, from the number and extent of their operations, might become the most powerful instruments of oppression in our whole system of administration. Being creatures of the law, entrusted with the exercise of sovereign powers to subserve public necessities and uses, they are bound to conduct their affairs in furtherance of the public objects of their creation. "It is true," observes Shaw, C. J., in *Worcester* v. *Western R. R. Co.*, 4 Metc., 564, "that the real and personal property necessary to the establishment and management of the railroad is vested in the corpora-

tion, but it is in trust for the public. The company have not the general power of disposal incident to the absolute right of property; they are obliged to use it in a particular manner and for the accomplishment of a well defined public object."

In order to enforce such use of their franchises the writ of *mandamus* has been held to be an appropriate process. "This writ," says Lord Mansfield, in *Rex* v. *Barker*, 3 Burr, 1267, "ought to be used upon all occasions when the law has established no specific remedy, and where in justice and good government there ought to be one." The value of the matter or the degree of its importance to the public policy is not scrupulously weighed; if there be a legal right, and no other specific remedy, this should not be denied. This writ lies to compel persons or corporations to do a certain specific act, as being the legal duty of their office, character or situation. Ang. & Ames on Corp., 694.

In *State* v. *Railroad Company*, 29 Conn., 528, the court say "all jurists and judges will at once agree that chartered companies are obliged fairly and fully to carry out the objects for which they are created, and that they can be compelled by *mandamus* to do so." In that case the court compelled the company to run its cars over its track to a railroad station that it had discontinued.

This writ lies to compel a railroad company, bound by act of of parliament to set out their deviations and make their compulsory purchases within stated periods, to do those acts within the times limited, also, to compel a company to reinstate and lay down again the railway it had taken up, or a water power company to erect and maintain a bridge at its own expense, rendered necessary by extending its trench across the highway, at the suit of the attorney general where the public interests are involved, or to compel a railroad company to keep railroad crossings in repair, or to remove obstructions to navigation, caused by the improper manner in which the road is built. Ang. & Ames on Corp., 711 and 713; *State* v. *Gorham*, 37 Maine, 461; *State* v. *N. E. R. R. Co.*, 9 Pick., 212.

It has also been held, in numerous cases, that ample power over

this subject exists in the legislature. In *Buckman* v. *Saratoga*, 3 Paige, 34, the chancellor says, "the legislature may from time to time regulate the use of the franchise and limit the amount of toll which it shall be lawful to take in the same manner as they may regulate the amount of tolls to be taken at a ferry, or for grinding at a mill, unless they have deprived themselves of that power by a legislative contract with the owners of the road."

The court in Massachusetts had this subject under consideration in *Commonwealth* v. *Eastern R. R. Co.*, 103 Mass, 258, and sustained the constitutionality of an act of the legislature compelling the company to establish a flag station on its road and erect a station house there, at which at least two trains each day and each way should stop.

The language of the court in that case is peculiarly appropriate in the case at bar. "If," say the court, "the directors of a railroad were to find it for the interest of the corporation to refuse to carry any freight or passengers except such as they might take at one end of the road and carry entirely through to the other end, and were to refuse to establish any way stations, or to do any business for that reason, though the road passed for a long distance through a populous part of the State, this would be a case manifestly requiring and authorizing legislative interference under the clause in question. And on the same ground, if they refuse to provide reasonable accommodations for the people of any smaller locality, the legislature may reasonably alter and modify the discretionary powers which the charter confers upon the directors, so as to make the duty to provide the accommodation absolute." It might be added that cases may occur where railroad directors might do this from motives of resentment or ill will, or a pecuniary interest in building up the towns or cities at the termini of the road, to the injury of intervening localities.

The charter of the Portland and Oxford Central Railroad Company, § 1, provides that "said corporation . . . shall be bound at all times to have said railroad in good repair, and a sufficient number of suitable engines, carriages and vehicles for the transporta-

tion of persons and articles, and be obliged to receive, at all proper times and places, and convey the same when the appropriate tolls therefor shall be paid and tendered."

By § 11, of the charter, it is provided "that the legislature shall, at all times, have the right to inquire into the doings of the corporation, and. into the manner in which the privileges and franchises herein and hereby granted may have been used and employed by said corporations, and to correct and prevent all abuses of the same . . . but not to impose any other or further duties, liabilities or obligations; and this charter shall not be revoked, annulled, altered, limited or restrained, without the consent of the corporation, except by due process of law."

By § 6, the president and directors, under direction of the stockholders, have authority to exercise all the powers granted to the corporation for locating, building, completing and running the road, and all such power as may be necessary and proper to carry into effect the objects of the grant.

The duty of the corporation in respect to the subject under consideration is enjoined in that provision of the charter which requires it "to receive at all proper times and places, and convey persons and .articles." It is contended in behalf of the corporation, that the power to determine what are "proper" times and places for the purposes stated is discretionary with the directors, and that their decision is conclusive and final; and, on the part of the State, it is claimed that the duty thus enjoined upon the corporation is imperative and absolute, and that the State has the power, through its appropriate tribunals, to determine whether it has been performed, and to enforce a performance, if there has been none, or only a partial one.

In determining this question, it should be remembered that the object of the grant was to secure the construction of a public highway, and that, to be serviceable to the public, such highway must be accessible and available at other places than the termini, and oftener than once a month or once a week, or indefinitely and irregularly. The charter must have a construction reasonable,

and consistent with the public objects to be promoted under it; and not such an one as tends to impair, defeat or subvert these objects.

By the same section that contains the provision in question, the corporation is required "to have its railroad in good repair and a sufficient number of suitable engines, carriages and vehicles for the transportation of persons and articles."

The language of the charter is not, that it shall be optional with the corporation what number and kind of engines, carriages and vehicles to furnish, at what times and places to receive and convey persons and freight, and what state of repair to keep the road in; or that it shall put in such rolling stock as it may deem "suitable and sufficient," build such depots as it may think "proper," and keep the road in such repair as it may pronounce "good;" but the meaning of the language is that the several things required to be done shall respectively be, "suitable and sufficient," "proper" and "good;"—in other words, that they shall in fact reasonably be of the description specified. The qualifying words do not change the rights of the parties under the charter. The duty of the corporation and the rights of the public in these respects would have been the same as they now are, if the charter had simply required the corporation to keep its road in repair, furnish it with rolling stock, and receive and convey passengers and freight along the line of its road. Under such provisions of the charter, it would be the duty of the corporation to keep the road reasonably safe, provide such rolling stock, establish such depots, and operate the road in such a manner as would afford the public reasonable safety and dispatch in the transaction of business upon the road. The duties enjoined upon the corporation are ministerial duties, to do and perform what the public convenience and necessity reasonably require, in respect to the particulars specified. Not is it within the discretion of the directors to determine ultimately what these public ministerial duties are, or the manner in which they are to be performed; to hold so would be to concede to the directors the power to promote the private interests of

the corporation, by subverting the public objects to be sub-served by the charter; the power both of determination and enforcement are necessarily vested in State authority.

It has been repeatedly held that the general duty of municipal corporations "to keep their highways in repair" is ministerial, and that a writ of *mandamus* lies to compel its performance, because it is a ministerial, in contradistinction from a discretionary duty. *A fortiori*, the duties enjoined under the eighth section of the charter of the defendant corporation are ministerial, since to their public character is superadded the obligation of performance, rest-ing in contract. Indeed, our whole system of legislative super-vision, through the railroad commissioners, acting as a State police over railroads, is founded upon the theory that the public duties devolved upon railroad corporations by their charter are ministerial, and therefore liable to be thus enforced. Dillon on Mun. Corp., 293. *Uniontown* v. *Commonwealth*, 34 Penn. St. R., 293; *Hannah* v. *Covington*, 3 Metc. (Ky.) 494.

If the corporation is the ultimate judge of its duty to the pub-lic in respect to the particulars under consideration, the latter are without power to prevent, or remedy to recover compensation for, injuries to persons or property resulting from the failure of the corporation to maintain, equip and operate its road according to the requirements of section eight of its charter. An action at law to recover damages sustained from such cause, even against a responsible corporation, would be unavailing, since the corpora-tion would offer the same defence to such action that is now made to this process.

The construction of the charter set up in defence is obviously against public policy. Suppose, for illustration, that the Eastern Railroad Company, now understood to have control of the Maine Central Railroad, with like provisions in its charter, should decide "to receive and convey persons and articles" on its railroad only at Bangor and Boston, what would the right of public use of that road be worth to the city of Portland and the people residing along its line, remotely from and between those cities? And what

would be the effect of this arrangement upon the business of those cities, and the intervening towns and cities respectively? Would not such illegal action be a substantial denial of the right of the latter to use the road, and tend to paralyze their business for the benefit of the former?

To make railroad directors the sole and ultimate judges of "the times and places" when and where the corporation will "receive and convey persons and articles" on the line of its road, would be to give railroad corporations the power to control the markets of the country, to create a surplus, or a famine, in agricultural, mineral and other products; to raise or reduce the wages of labor; and to promote, or retard, at pleasure, the growth, prosperity and welfare of towns, cities and country. A construction that leads to such results is inconsistent with the nature of the grant to the defendant corporation, contrary to its spirit, and subversive of the public objects it was intended to promote. The legislature will not be held to be so indifferent to the trust committed to it, as to divest itself and the State tribunals of authority over the manner in which the franchises granted by it are to be exercised in the important particulars under consideration, unless its intention to do so is expressed in specific terms.

The charter of the corporation in question contains no such expression. On the contrary, it explicitly negatives such intention, in the provision it makes for legislative inquiry into the manner in which the privileges and franchises granted have been exercised and employed, with a view "to correct and prevent all abuses of the same." And what more fitting occasion for such inquiry could there be than the public grievance we are considering?

This provision of the charter contemplates and sanctions the legislation of 1871 upon this subject. That act does not "enforce any new duties, liabilities or obligations" upon the corporation, but simply provides a remedy for enforcing the performance of existing ones. It does not add an iota to the burdens devolved upon the corporation by its charter, but it simply provides a mode of inquiring into the manner in which the corporation has exercised its privileges and franchises with respect to the right of the

public to use its road, and if need be, "to correct and prevent its abuses" of its franchise in this respect.   Instead of inquiring into and correcting the alleged abuse, itself, as the legislature of Massachusetts have done in several instances, with the subsequent sanction of the supreme court of that State, the legislature, avoiding the imputation of exercising judicial functions, empowered an existing tribunal to determine that question; a tribunal, it may be observed, quite as likely to afford the parties a full and impartial hearing, and to render as intelligent a decision as would be secured by the direct action of the legislature.   The constitutional power of the legislature to confer such jurisdiction and authority over this subject upon the railroad commissioners is unquestionable, since the legislature, as we have seen, has the right to provide for the correction and prevention of all abuses of the franchises of the corporation.

While, therefore, we are by no means of the opinion that the public would have been without remedy in respect to the grievance complained of, through the supreme judicial tribunal of the State, if the act of 1871 had not been passed, we see nothing in that act that conflicts with the rights of the corporation represented by the defendant.   On the contrary, we think that the charter of that corporation contemplates and authorizes that legislation, which provides a constitutional and convenient mode of preventing and correcting the abuses of railroad corporations in respect to the public uses and benefits they were intended to subserve and confer, and to the full enjoyment of which the public have a right to be admitted.

It is suggested that the case of *State* v. *Noyes,* 47 Maine, 205 and 209, is in conflict with the conclusion to which we have arrived in the case at bar.   We think otherwise.   Two questions were decided in that case :

I. That inquiries into the alleged abuses of the privileges and franchises granted to railroad corporations, in given cases, come within the exclusive jurisdiction of the judicial department of the government.   That objection does not lie here, as the legislature did not undertake to decide the question in controversy

itself, but conferred that power upon an existing tribunal. Besides, the supreme court in Massachusetts, as it must be conceded with great force of reasoning, both before and since the decision in *State* v. *Noyes*, have decided that question otherwise, fully sustaining the constitutional authority of the legislature to decide the question of alleged abuse itself, without the intervention of the judiciary department. *Commonwealth* v. *Eastern R. R. Co.*, ante; *Roxbury* v. *Boston & Providence R. R. Co.*, 6 Cush., 424.

II. The other question decided in *State* v. *Noyes*, was that the act of the legislature, modifying the rules and regulations of the company touching the time of departure of trains, was inconsistent with the provision in the charter authorizing the directors to establish rules and regulations upon that subject, there being no abuse in the exercise of .this authority by the directors. The directors in the discharge of their duty in this respect had fixed the time for the departure of trains at the place in controversy. It was not pretended that these were unreasonable, or established in bad faith. The corporation, moreover, had a depot at that point for receiving and discharging freight and passengers, suitable and sufficient to accommodate the public in that vicinity. The act of the legislature, requiring the train first arriving at the crossing to wait twenty minutes for the arrival of the train upon another road, was held to be a modification of the regulations made by the directors under authority of the charter. In the case at bar, there is no modification of chartered rights by the legislature, but simply an inquiry instituted into an alleged abuse of the company's franchise, with judicial powers conferred upon an appropriate tribunal to enforce the performance of the public duties enjoined by the charter, if such abuse shall be found to exist. When carefully examined, the case of *State* v. *Noyes* will be found to be not inconsistent with the result to which we have arrived in the case under consideration.

The case shows that there was a full hearing of the parties, and a thorough examination of the case by the railroad commissioners, and we see no reason for a further hearing at the bar of this court. *Exceptions overruled.*

CUTTING, WALTON, BARROWS and DANFORTH, JJ., concurred.