MAINE CENTRAL RAILROAD COMPANY
*vs.*
PUBLIC UTILITIES COMMISSION

Kennebec.   Opinion, August 3, 1960.

*Leonard A. Pierce,*
*John E. Harrington, Jr.,*
*Archibald Knowles,*
*Vincent L. McKusick,* for plaintiff.

*Richard B. Sanborn,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

WEBBER, J.   On exceptions.   On July 8, 1959 the Maine Central Railroad Company, hereinafter referred to as the

"Railroad," filed with the Public Utilities Commission a petition for authority to discontinue as of October 25, 1959 its remaining scheduled passenger train service. Involved were eight trains furnishing three round trips daily between Portland and Bangor and one round trip between Portland and Vanceboro. After extended hearings, the Commission on January 14, 1960 granted the discontinuance of service via Lewiston-Auburn, but ordered the Railroad to continue operating for a period of not less than one year four trains furnishing service via Augusta. The Railroad in effect asserts that the Commission has made findings of fact unsupported by substantial evidence, has failed to make material findings of fact based on undisputed evidence, and has erroneously applied the applicable law to the established facts. There is no real dispute as to the factual situation and the issue presented is one of law. Since our disposition of the first exception is decisive of this case, it will be unnecessary to consider the other exceptions raised which are essentially subsidiary thereto.

In view of the revolution which has occurred in methods of transportation, it should come as a surprise to no one that a railroad may regard the carriage of passengers as an intolerable and oppressive financial burden. The obvious preference of most of the traveling public for the automobile and the airplane has produced an astonishingly rapid increase in their use with a correspondingly sharp decline in the use of passenger trains. Interest in and concern for the preferred methods of travel have been evidenced by large and ever increasing expenditures of public funds for the extension and improvement of the highway system and airport facilities. The railroads have been afforded the doubtful privilege of aiding the development of such effective competition by the payment of very substantial taxes. In short, times have changed and railroads no longer have any practical monopoly of transportation. As was stated in

*Illinois Central R. R.* v. *Illinois Commerce Commission* (1951), 410 Ill. 77, 101 N. E. (2nd) 588, 593: "In the light of such changed conditions it is a duty of the carrier (railroad) to seek, and of the regulatory agency to permit, elimination of uneconomic services no longer needed or used by the public *to any substantial extent.* The reasons which originally may have provided justification for compulsory facilities maintained at substantial losses have largely disappeared today, rendering local train service in many cases an obsolete form of transportation." (Emphasis ours.) See also *Application of Chicago, B. & Q. R. Co.* (1950), 152 Neb. 352, 41 N. W. (2nd) 157.

The statutory authority of the Commission to act in such a case as this is afforded by R. S., 1954, Chap. 44, Sec. 48, the pertinent portions of which state:

"No public utility * * * shall * * * discontinue the service which it is rendering to the public by the use of such facilities, without first securing the approval of the commission. In granting its approval, the commission may impose such terms, conditions or requirements as in its judgment are necessary *to protect the public interest."* (Emphasis ours.)

The test is therefore the protection of the "public interest." In so saying we are not merely concerned with that segment of the public which may actually use the trains for passenger travel. It is the interest and the necessities of the *whole* public which must control the ultimate decision. In our view, the legislature by its wording of the quoted statute intended the recognition of the same broad standard announced by the courts of a number of states in passenger train discontinuance cases. *Application of Chicago and North Western Ry. Co.* (1958), 167 Neb. 61, 91 N. W. (2nd) 312 (public necessity and not local convenience) ; *Western Maryland Ry. Co.* v. *Public Service Com'n.* (1959), 106 S. E. (2nd) (W. Va.) 923 (interest of whole public) ; *Susque-*

*hanna Transit Com. Ass'n.* v. *Bd. of P. U. Com'rs.* (1959), 55 N. J. Super. (App. Div.) 377, 151 A. (2nd) 9 (interest of the public generally).

The Railroad has been faced with a trend which is national rather than merely local. In 1949, 83.6% of the passenger travel in this country was by private automobile. By 1957 that figure had increased to 88.7%. In the same period railroad passenger traffic dropped from 8% to 3.7%. Meanwhile air travel increased from 1.9% to 3.9%. In Maine substantially less than 1½% of passenger travel in the area served by the Railroad was by rail in 1959. All the rest moved by air and by busses and automobiles, the latter traveling over the Maine Turnpike and the main public highways between the communities served by the Railroad. By 1957 there was a passenger automobile for every 3.4 persons. In 1959 less than ½ of 1% of the population of those communities made any use of the passenger service offered by the Railroad. Here also railroad passenger travel has been steadily declining. From 1949 to 1958 the number of passengers showed a drop of 65.5% and estimates of 1959 business indicated that the percentage of reduction in passenger use would reach 83%, this in a decade which produced a 60% *increase* in travel by all means of transportation.

Who are the people who still make some use of the passenger service offered by the Railroad? They are not commuters as the Railroad offers no commuter service whatever. Many are non-residents who merely pass through the state without stopping or transacting any business in Maine. Such passengers must be disregarded in assessing any need which the public of this state may have for the service. For the most part, if we may judge by the evidence adduced at the several public hearings conducted by the Commission in various parts of the state, those who urge the retention of passenger service do so either out of senti-

mental nostalgia for an era of railroading now past, or out of a sense of community pride, or because they desire the security of knowing that the trains are there, standing by for the day when the weather is inclement or other preferred means of transportation fail. As the court said in *Western Maryland Ry. Co.* v. *Public Service Com'n., supra* at page 925: "Though such system formerly afforded an extensive and excellent passenger service to the public, that service is now at the last 'mile post.' But common carriers are not required to furnish such service for sentimental reasons. They are entitled to reasonable profits." The uniform aspect of these hearings lay in their failure to produce witnesses who demonstrated any real need of the service on a week by week or even a month by month basis. The Railroad is thus required at great expense to serve customers who will buy its product only when they can procure that product nowhere else. Moreover, under ordinary circumstances the product is readily available elsewhere. We are satisfied that the evidence permits only one conclusion, that the *actual need* for this service is so small as to be almost non-existent.

The Railroad has been criticized for not making its service more attractive to passengers. It has been charged with faulty housekeeping and unsatisfactory schedules, and has even been accused by some witnesses of deliberately attempting to discourage passenger use of its facilities. Any present lack of interest in attempting to increase the patronage of its passenger trains may well be attributed to the frustrating experiences of recent years. For the Railroad has made determined attempts to please and attract passenger business. It is significant that such efforts, the purchase of new and most modern equipment, the employment of all advertising media, the use of reduced fares for multiple rides and group travel, all completely failed to halt or even retard the steady reduction in passenger travel. The

train cannot transport a passenger from his home to his destination on a schedule of his own making as can the private automobile, nor can it carry him with the speed of an airplane — and these appear to be the over-riding considerations which dictate the choice of the traveling public and create the trend which must be recognized as one of the realities of our day. In the face of a similar criticism of promotional methods, the Texas court in *Texas & New Orleans R. Co.* v. *Railroad Commission* (1949), 220 S. W. (2nd) 273, 275, noted: "Few of those who so travel know or care if the train operates over the route they intend going; they neither know nor care whether the train coach is modern or not; they are not interested in when the train leaves or when it returns. Most people never even inquire as to such matters. They use their own cars." We could only add, "or board a plane."

What is the cost of furnishing this service to a tiny segment of the traveling public? An accountant who made some studies at the request of the Commission placed the minimum avoidable losses from the conduct of passenger service at $744,480 a year. Admittedly, in addition to this potential saving, there are some costs common to both freight and passenger service which would be reduced by elimination of the latter entirely, and there is the further opportunity for increasing profits from freight service by management decision made possible by relief from the burden of passenger service. Since opinions were quite divergent as to the extent of these additional savings, it is enough to say that the Commission could properly find no less upon the evidence than that the avoidable losses would substantially exceed three-quarters of a million dollars annually. This amount assumes even more serious proportions when we examine the somewhat dubious financial position of the Railroad. Although the Railroad has remained solvent thus far, its net earnings are entirely inadequate

to provide necessary funds for proper replacement and improvement of equipment. It is in arrears as to payments of dividends on preferred stock and has paid no dividends on its common stock since 1931. Even more disturbing is the fact that the trend of earnings has been downward in the past few years. The Railroad is the sole guarantor of first mortgage bonds of its wholly owned subsidiary Portland Terminal Company in the amount of $9,350,000 which fall due July 1, 1961. The ability of the Railroad to refund these bonds on any reasonable basis is quite understandably a matter of genuine concern and even alarm on the part both of management and investment counsel charged with the responsibility of maintaining credit. The margin of safety, the amount by which gross revenues could decline before the Railroad lost coverage of its fixed charges has declined from 9% in 1956 to about 4.97% in 1959. The adverse trend is further demonstrated by the drop in rate of return on investment which moved from an inadequate 4% in 1956 to a confiscatory level of 2.84% in 1958. As the late Chief Justice Vanderbilt succinctly stated in the landmark case of *Pennsylvania-Reading Sea. Lines* v. *Board of Pub. U.* (1950), 5 N. J. 114, 74 A. (2nd) 265, 270:

> "There can be no doubt of the power of a state functioning through an administrative body to regulate the services and facilities of common carriers so that the public necessity and convenience will be accommodated, but that power is not unlimited; it is circumscribed by the provisions of the United States Constitution. Under the guise of regulation the property of a railroad may not be taken by requiring it to furnish services or facilities not reasonably necessary to serve the public. * * * The obligation is dependent upon the need; without the need, the obligation does not exist."

It may be noted that the United States Supreme Court denied certiorari in this case. 340 U. S. 876, 71 S. Ct. 122,

95 L. Ed. 637. See also *Chicago & N. W. Ry. Co.* v. *Michigan Public Service Com'n.* (1951), 329 Mich. 432, 45 N. W. (2nd) 520.

The Railroad necessarily looks to its freight carriage for well over 90% of its gross revenue. Continuation of some passenger service losses might perhaps be justifiable if profits from freight business were steady, dependable and adequate to keep the entire operation on a sound financial basis. Unfortunately, however, here again storm warnings are out. Freight business has also been declining year by year. Competition with the trucking industry operating over tax-supported highways has become more vigorous with each passing year. In 1958, 57.09% of the freight profit was required to subsidize the passenger service and absorb the passenger deficit. In our view, this is an unreasonably high subsidy level and effectively prevents the Railroad from modernizing its freight carrying methods and equipment so as to remain truly competitive.

There can be no question as to the very real need which the whole public of Maine has for an efficient freight service by rail. There are many raw materials and products of great weight and bulk which can only be carried efficiently in and out of Maine in freight cars. This state is somewhat remote from the principal markets and thus dependent on fast and economical transportation of goods. We are engaged in spirited competition with our sister states for new industry which will add to payrolls and taxes and assure the economic health of Maine. Moreover, existing established industry must be encouraged and preserved and agriculture must not be deprived of indispensable freight service. Here we are dealing with the *public interest* in its broad sense for every citizen of Maine has a stake in the industrial and economic vitality of his state. Representatives of business and industry, and there were many, who gave evidence before the Commission were unanimous in

their conviction that the need for continued passenger service is negligible whereas the maintenance of good freight service by rail is absolutely essential to the economic future of Maine.

The Commission saw fit to discontinue half of the passenger service operated by the Railroad but ordered it to continue four of its trains for a trial period of one year. We are satisfied that the somewhat precarious financial position of the Railroad sets limits to the risks which may be taken with its ability to furnish proper freight service. This is especially true when past experience and present trends make it possible to foretell with relative certainty the disappointing and unsatisfactory result of the experiment. The evidence makes it abundantly clear that there is some urgency in this matter and any further impairment of the capacity of the Railroad to perform its essential function as a freight carrier is not in the public interest. In our view, the convenience and preferences of some and the needs of a very few must yield to the interests of all. We think that the Railroad has shown by strong and undisputed evidence that it is justly entitled to cast off *now* this intolerable burden and that no further delay based on illusory hopes of a reversal of trends in the field of transportation can be justified.

In summation, counsel for the Railroad have suggested for our consideration six factors which commend themselves to reason and find support in respectable authority and which should be considered as proper criteria in determining what is in the "public interest." 1. What use is the public making of passenger service? The evidence discloses a nominal and ever diminishing use by the traveling public of Maine, based primarily on mere convenience or preference rather than need. 2. What is the financial position of the carrier? The evidence permits no other conclusion than that present trends, if continued without check,

will impair the credit of the Railroad and eventually undermine its actual solvency. 3. What is the relation of the passenger deficit to the capacity of the Railroad to absorb losses? As has been noted, the avoidable losses from passenger service are high and ever increasing and are absorbing a dangerously large percentage of freight profit. 4. What are the necessities of Maine industry and agriculture? Here again the evidence is clear that the need is for a fast, efficient and economical freight service by rail, the importance of which can hardly be overstated. 5. Are the alternative means of passenger transportation adequate to the needs of the traveling public? The evidence shows that upon discontinuance of train service, the communities involved will be served by air at terminals in the principal cities, by automobile over public highways and the Maine Turnpike, and by bus service available throughout the area now served by the Railroad and offering comparable transit times and somewhat cheaper fares. These alternative services are in fact the very ones for which the public has increasingly shown a marked preference. All of these services are being constantly improved by the expenditure of large sums of public funds for airports and highways. The Railroad has assured continued service to campers and charter groups by special trains. As competition has developed between the railroad and trucking industries, it has been increasingly difficult for the Railroad to reconcile schedules required by the U. S. postal authorities with those which might be most attractive to passengers. The Railroad proposes to continue the carriage of mail and express on schedules and by non-passenger carrying trains suited to the needs and requirements of these services. Since mail and express have provided the principal revenue from passenger trains heretofore, it is desirable that the Railroad should seek to retain these revenues and that the general public should not lose any advantages, where they exist, from continued mail and express carriage by rail. 6. What are the

interests of the Railroad's investors in passenger train discontinuance? The evidence makes the answer to this question quite obvious. The securities of the Railroad are widely held by private and corporate investors in Maine. Every depositor has an interest in the investment portfolio in his bank. Those who have an interest as investors in the Railroad, therefore, form a not inconsiderable segment of the public of this state. They may not be ignored in a proceeding of this nature. Whatever hope the common stockholders have of ever receiving a dividend, or the preferred stockholders of being paid both their arrearage and future dividends as they accrue, or the bondholders of ultimately being paid in full, lies in the elimination of passenger train losses and the development and improvement of a profitable freight service. The Railroad is entitled to earn a fair return on its investment and is currently earning only 2.84%. This fact alone should furnish a deterrent to withholding the most obvious remedy. When the arm is hopelessly gangrenous and amputation is indicated, further delay may cause the whole body to be beset and the patient to die. The time for remedial action is now and not many months from now.

The Railroad has made out its case for immediate discontinuance of all passenger service involved in its petition by substantial and virtually undisputed evidence. It cannot be required to do more in order to obtain necessary relief and protection of the law. As was said in *Application of Chicago & N. W. R. R., supra,* at page 315:

> "The purpose of commission control of railroads is to secure adequate, sustained service for the public at a minimum cost. The commission is not in the position of an owner. It has a duty to the railroads as well as to the public. It must protect and conserve the investments in the railroads and insure a reasonable return to railroads that are efficiently maintained and operated. But where,

as the evidence in this case demonstrates, passenger trains are operated at great loss due to a large decrease in passenger traffic, and no real public need exists for their continuance, the railway company *is entitled to an order discontinuing such trains.*"

The entry will be

*Exceptions sustained.*

*Remanded to the Public Utilities Commission for a decree forthwith authorizing discontinuance in accordance with this opinion.*