**BANGOR AND AROOSTOOK RAILROAD COMPANY et al., Plaintiffs, Appellants,**

v.

**BANGOR PUNTA OPERATIONS, INC., et al., Defendants, Appellees.**

**No. 73-1059.**

United States Court of Appeals, First Circuit.

Heard May 7, 1973.

Decided Aug. 3, 1973.

Edward T. Robinson and Alan L. Lefkowitz, Boston, Mass., with whom Ely, Bartlett, Brown & Proctor, Boston, Mass., and Roger A. Putnam, Howard H. Dana Jr., and Verrill, Dana, Philbrick, Putnam & Williamson, Portland, Me., were on brief, for plaintiffs-appellants.

James V. Ryan, New York City, with whom C. Kenneth Shank, Jr., Bruce Topman, Webster, Sheffield, Fleisch-

mann, Hitchcock & Brookfield, New York City, and Sumner T. Bernstein, Herbert H. Sawyer and Bernstein, Shur, Sawyer & Nelson, Portland, Me., were on brief, for defendants-appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

A Maine railroad corporation and its wholly-owned subsidiary bring this action against their former owners, seeking damages under the federal anti-trust and securities laws, and under state law, for the alleged "looting" of the railroad in 1960–67 when the defendants were in control. Over 99% of its stock was purchased from the old owners after the alleged wrongs. The district court granted defendants' motion for summary judgment, holding that the railroad could not maintain what it termed "typical stockholder claims seeking an accounting for alleged misappropriation and waste of corporate assets by controlling stockholders" since the present owner was not a stockholder at the time of the alleged improper transactions and was not injured thereby. 353 F.Supp. 724, 728 (D. Me. 1972).

Plaintiff, Bangor and Aroostook Railroad Company (BAR),[1] operates a railroad in northern Maine. Plaintiff, Bangor Investment Company (BIC), a Maine corporation, is a wholly-owned subsidiary of BAR. Defendant, Bangor Punta corporation (Bangor Punta), a Delaware corporation the stock of which is listed upon the New York Stock Exchange, is a diversified holding company. Defendant, Bangor Punta Opera-

tions, Inc. (BPO), a New York Corporation, is a wholly-owned subsidiary of Bangor Punta.

Bangor Punta, in 1964, through its subsidiary BPO, acquired 98.3% of the stock of BAR, by acquiring all the assets of Bangor and Aroostook Corporation (BAC), a Maine holding company established by BAR in 1960. Bangor Punta, through BPO, continued to own 98.3% of BAR's outstanding stock until October 2, 1969, at which time, for $5,-000,000, it sold its stock interest in BAR to Amoskeag Company (Amoskeag), a Delaware investment corporation controlled by Frederick C. Dumaine, Jr. Amoskeag later bought additional BAR shares, and now owns over 99% of all the outstanding stock of BAR.

The complaint contains thirteen counts. Damages totalling $7,000,000, for BAR only, are sought on grounds of mismanagement, misappropriation and waste of corporate assets caused by four intercompany transactions taking place among BAC, Bangor Punta, BAR and BIC during the years 1960–67, while BAC and then Bangor Punta were in control of BAR and BIC. The defendants are said to have violated § 10 of the Clayton Act, 15 U.S.C. § 20, and § 10(b) of the Securities Exchange Act, 15 U.S. C. § 78j(b), and Rule 10b–5 thereunder. They are also alleged to have violated the Maine common law and Section 104 of the Maine Public Utilities Act, 35 M. R.S.A. § 104.

The wrongful acts allegedly included overcharge by BAC and BPO for services to BAR; causing BAR to excuse BAC and BPO from interest payments due on loans and to pay improper dividends; the improper acquisition of St.

---

1. It is alleged in the complaint that BAR "is a Maine Corporation organized in 1891 for the purpose of constructing, maintaining and operating a railroad for public use, and has its principal place of business in Bangor, Maine. It operates a railroad providing essential services for those persons and businesses located in the northern part of the State of Maine. BAR connects within the State of Maine with other railroads which serve the northeastern part of the United States, and which, in turn, connect with other railroads serving the remainder of the United States. Freight shipments of BAR consist of products grown and manufactured in the State of Maine, including potatoes, pulp and paper products, which are sold and used in other parts of the United States."

Croix Paper Company stock owned by BAR through BIC; and causing BIC to engage in improper borrowings. In essence, defendants are alleged to have "dominated and controlled BAR and exploited it solely for their own purposes, to the injury of BAR and without regard to BAR's future obligations both to its creditors and to the public which it serves. By such domination, control and exploitation, [defendants] calculatedly drained the resources of BAR in violation of law for their own benefit . . . ."

The defendants moved for summary judgment "dismissing the entire complaint, as amended herein, with prejudice, for the reason that the complaint fails to state a cause of action on behalf of the corporate Plaintiffs; or in the alternative . . . dismissing each of Count II and Count V [brought under the Maine Public Utilities Act] of the amended complaint herein, with prejudice, for the reason that each of them fails to state a cause of action."

The district court granted defendants' motion, stating,

"Defendants seek dismissal of the entire complaint on the ground that Amoskeag, which would be the sole beneficiary of any recovery by the corporate plaintiffs, was not a stockholder of BAR at the time of the alleged improper transactions and itself sustained no injury as a result thereof. The Court agrees. Since the Court therefore concludes that the entire complaint must be dismissed, it does not reach defendants' alternative motion for dismissal of Counts II and V." 353 F.Supp. at 726.

Starting with the proposition that F. R.Civ.P. 23.1, the so-called contemporaneous ownership rule, would apply to a shareholder's derivative action brought to enforce the claims asserted here, the district court reasoned that Amoskeag, by causing the plaintiff corporations (essentially BAR) to bring this action, was attempting to accomplish indirectly what it could not do directly; namely, to bring "typical stockholder claims" for misappropriation and waste. Since Amoskeag,

"which did not itself incur any damage as a result of defendants' wrongful acts, and not the corporate plaintiffs, is the real beneficiary of any recovery which might be had in the name of the corporate plaintiffs, the corporate claims must fail for lack of equity on the part of those who would ultimately benefit from any corporate recovery." 353 F.Supp. at 728.

The district court relied on Commissioner Roscoe Pound's opinion in Home Fire Ins. Co. v. Barber, 67 Neb. 644, 661–662, 93 N.W. 1024, 1030–31 (1903), and like cases. See, e. g., Capitol Wine & Spirit Corp. v. Pokrass, 277 App.Div. 184, 98 N.Y.S.2d 291, aff'd, 302 N.Y. 734, 98 N.E.2d 704 (1951); Amen v. Black, 234 F.2d 12, 23 (10th Cir. 1956). Matthews v. Headley Chocolate Co., 130 Md. 523, 100 A. 645 (1917). *Home Fire* and its successors hold that a person who was not a stockholder at the time of the alleged mismanagement of a corporation may not later sue derivatively, nor, if he becomes the sole stockholder, may he cause the corporation itself to sue. Central to the conclusion that even the corporation may not sue is the assumption that "the stockholders are the real and substantial beneficiaries of a recovery." Home Fire Ins. Co. v. Barber, *supra*, 67 Neb. at 669, 93 N.W. at 1033. Equity, "penetrating all fictions and disguises", treats the corporation as the alter ego of its stockholders: because it would be unjust to enrich them, the corporation may not be enriched. A corollary is that the corporation is barred from suing only if recovery would inure solely to the benefit of the estopped stockholders. If other eligible interests, such as creditors or minority shareholders, would benefit, the corporation may sue; since recovery is for the corporation the estopped stockholders would also benefit, but that is "an injustice which might be necessary to be suffered . . . ." Capitol Wine & Spirit Corp. v. Pokrass, *supra*, 98 N.Y.S.2d at 293.

The *Home Fire* rule prevents a purchaser of all or most of the corporate stock, who probably purchased it at a price tied to the value of the assets at the time of sale, from recovering a windfall. Where maintenance of the corporate cause of action serves no other interest, such a result seems reasonable —although we leave open whether the equities reflected in *Home Fire* should be permitted to prevent suits under laws, such as the federal anti-trust and securities acts, that were enacted to protect interests other than, or in addition to, those of the current stockholders. *Cf.* Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 139, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).

Our difficulty here, however, is more fundamental. Even accepting *Home Fire*, we doubt its applicability. We reject the premise—critical both to the district court's holding and to the *Home Fire* rationale—that BAR's chief stockholder, Amoskeag, would be the "sole beneficiary" of a recovery by BAR. The premise, applied to a rail carrier, seems to us to be an over-simplification, although, without doubt, BAR's recovery would be highly beneficial to Amoskeag. Because of the nature of their services and of regulatory restrictions affecting them, and, more generally, because of their legal status as "quasi-public corporations", railroads cannot realistically be described as mere alter egos of their chief stockholders. If BAR's management complies with the law, recovery of monies by BAR may be expected not only to benefit its stockholders but to improve the economic position of the carrier, enabling it to enhance its services and helping stave off the financial crisis faced today by so many railroads. The net result likely will be of benefit to the public. Such considerations might be irrelevant in cases involving ordinary, closely held businesses; their survival is not usually deemed to be of public concern and they are typically viewed as mere projections of their stockholders. But courts—even before passage of extensive regulatory laws—have for years held that the public has an identifiable interest in a railroad corporation and in its ability—including its financial ability—to provide services and, indeed, to survive.

■■ The public's interest, unlike the private interest of stockholder or creditor, is not easily defined or quantified, yet it is real and cannot, we think, be overlooked in determining whether the corporation, suing in its own right, should be estopped by equitable defenses pertaining only to its controlling stockholder. Here we think the public's interest in the financial health of BAR provides a separate interest, quite apart from Amoskeag's, which is served by the corporate cause of action.[2] Thus, regardless of the latter's motivations or

2. Under the view we take of the case, we need not consider the district court's conclusion that the present suit is not being maintained in any meaningful way on behalf of the less than 1% of stock not owned by Amoskeag.

Nor do we analyze the extent to which the contemporaneous stock ownership rule is mandated, in a non-derivative action, by F.R.C.P. 23.1. Whether a stockholder is equitably barred from suit because he did not own the stock at the time of the alleged wrong or because he acquired it from wrongdoers is significant here only if we accept the district court's premise—as we do not—that BAR's controlling stockholder is the sole beneficiary of the instant litigation.

It can be argued, of course, that F.R.C.P. 23.1, dealing with derivative suits, does not establish a federal rule of contemporaneous ownership with respect to non-derivative proceedings. The underlying policies for adoption of the Rule— preventing transfer of a few shares to a non-resident to acquire diversity jurisdiction and to discourage strike suits— relate to abuses associated with minority stockholder proceedings. *See* Hawes v. Oakland, 104 U.S. 450, 26 L.Ed. 827 (1882); 3B Moore's Federal Practice, ¶ 23.1.15. The Maine Supreme Judicial Court has recently indicated willingness to relax the contemporaneous ownership requirement where fairness and sound policy warrant. *See* Forbes v. Wells Beach Casin, Inc., 307 A.2d 210 (Me. 1973).

potential receipt of undeserved benefits, BAR should be permitted, and indeed has a duty, to recover for itself any assets which were divested from it in violation of state or federal law.

■ A railroad is a "public" or "quasi-public" corporation. United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 321–322, 332–333, 17 S.Ct. 540, 41 L.Ed. 1007 (1897); Railroad Com'rs v. Portland and O. C. R. R., 63 Me. 269, 18 Am.Rep. 208 (1872); for a recent state case reaffirming the traditional concept, *see* Louisville and Nashville Ry. v. Sutton, 436 S.W.2d 487, 490 (Ky.Ct.App. 1969); *see generally* 1 Fletcher Cycl. Corps., § 63 (1963). According to the Maine Supreme Judicial Court,

> "Railroad charters are contracts made by the legislature in behalf of every person interested in anyhing to be done under them." Railroad Com'rs v. Portland and O. C. R. R., *supra*, 63 Me. at 278.

The provision of roads and "other artificial structures" for travel is a duty of government recognized from earliest times. *Id.* at 275. The granting of a franchise to operate a railroad was seen by the Maine court as a farming-out by government of a duty owed to the public.

> "The fare is the consideration for the service performed, whether done by the State directly, or by a corporation under a grant from the State; it is simply a substitute for the tax rendered necessary when the State builds and conducts railroads at the public expense; the corporation, upon the payment of the fare, is under the same obligation to render the required service for the public, that the State would be, if railroads were free, and conducted by State authority. Nor does the ownership of railroads, whether it be in the State or a private

corporation, affect the nature of their use, since in either case the function to be exercised and the uses to be subserved are public." *Id.* at 275–276. It can, of course, be argued that all manner of businesses are affected with a public interest. *See* Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77 (1877) (regulation of private grain elevators). However that may be, railroads, involving the use and often the forced taking of interests in land [3] and providing essential transportation, have acquired a unique status in our law; they were said by the Maine court in Railroad Com'rs v. Portland and O. C. R. R., *supra*, 63 Me. 275, to be "preeminent" among private instrumentalities affected with a public interest. While the development of other modes of transportation has eroded this "preeminence", the Maine courts have not modified their view of the unique legal status of railroad companies, which are also regulated "public utilities" under Maine Law, 35 M.R.S.A. [§ 15, subd. 13 et seq.]

Federal courts, including the Supreme Court, early took the same view of the public or quasi-public character of railroads. In United States v. Trans-Missouri Freight Ass'n, *supra*, 166 U.S. at 332–333, 17 S.Ct. at 555, the Supreme Court said,

> ". . . railways are public corporations organized for public purposes, granted valuable franchises and privileges, among which the right to take the private property of the citizen *in invitum* is not the least, . . . many of them are donees of large tracts of public lands, and of gifts of money by municipal corporations, and . . . they all primarily owe duties to the public of a higher nature even than that of earning large dividends for their shareholders. The business which the railroads do is of a public nature, closely affecting almost all classes in the community . . . ."

---

3. Beginning in 1850, Congress lavishly subsidized railroad construction by land grants: for example, an estimated 40,000,000 acres was granted to the Northern Pacific. Great Northern Ry.

v. United States, 315 U.S. 262, 276, 62 S.Ct. 529, 86 L.Ed. 836 (1942). Under Maine law, land may be taken for railroad purposes by eminent domain. 35 M.R.S.A. § 651 et seq.

More recently, the public importance of the rail carriers has been recognized in context of the economic crisis threatening their continued existence. Indeed, since the temporary nationalization of the railroads in World War I, the preservation of the railroads has been a national concern. Interpreting the Transportation Act, 1920, Mr. Justice Brandeis said,

"By that measure, Congress undertook to develop and maintain, for the people of the United States, an adequate railway system. It recognized that preservation of the earning capacity, and conservation of the financial resources, of individual carriers, is a matter of national concern; . . ." Texas & Pac. Ry. v. Gulf, etc., Ry., 270 U.S. 266, 277, 46 S.Ct. 263, 266, 70 L.Ed. 578 (1926).

In 1933, Congress added Section 77 to Chapter VIII of the Bankruptcy Act, providing for the financial reorganization of ailing railroads. A policy of Section 77 is "that the operation of railroads as sound, economic units should be achieved for the benefit of the public, regardless of the interests of creditors and stockholders." 5 Collier on Bankruptcy, 14th ed., ¶ 77.02. p. 469. In Reconstruction Finance Corp. v. Denver & R. G. W. R. R., 328 U.S. 495, 536, 66 S. Ct. 1282, 1303, 90 L.Ed. 1400 (1946), the Court said, "[B]y their entry into a railroad enterprise [security holders] assumed the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs." See New Haven Inclusion Cases, 399 U.S. 392, 492, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). Cf. Note, Takings and the Public Interest in Railroad Reorganization, 82 Yale L.J. 1004 (1973). Worry over the public effect of the Northeastern railroads' insolvency appears in the Interstate Commerce Commission's Northeastern Railroad Order of Investigation (Ex Parte No. 293, Feb. 7, 1973, 38 Fed.Reg. 6253 (1973)), noting the entry into Section 77 reorganization of seven Class I railroads, and the danger that acute cash crises of several might lead to the eventual cessation and liquidation of the transport facilities of the carriers. The I.C.C. found these matters to "create implications of nationwide importance." Similar concern resulting from the Penn Central financial crises was expressed in Senate Joint Resolution 59 approved Feb. 9, 1973 (P.L. 93–5, 87 Stat. 5, 1973 U.S. Code Cong. & Admin.News 379).

In 1960 the Maine Supreme Judicial Court concluded that local freight lines (BAR is one such) were crucially important to the Maine economy. The court said, in Maine Cent. R. R. v. Public Utilities Comm'n, 156 Me. 284, 163 A.2d 633, 637 (1960):

"There can be no question as to the very real need which the whole public of Maine has for an efficient freight service by rail. There are many raw materials and products of great weight and bulk which can only be carried efficiently in and out of Maine in freight cars. This state is somewhat remote from the principal markets and thus dependent on fast and economical transportation of goods. We are engaged in spirited competition with our sister states for new industry which will add to payrolls and taxes and assure the economic health of Maine. Moreover, existing established industry must be encouraged and preserved and agriculture must not be deprived of indispensable freight service. Here we are dealing with the *public interest* in its broad sense for every citizen of Maine has a stake in the industrial and economic vitality of his state."

Given today's circumstances of which we are all generally aware, and the legal history above cited, it would be unrealistic to treat a railroad's attempt to secure the reparation of misappropriated assets as of concern only to its controlling stockholder. To do so grants to the defendants an undeserved immunity from suit, to the disadvantage of the public, solely to avoid a windfall to Amoskeag which, whatever its own lack of equity, is neither a wrongdoer nor a

participant in any wrong. We see BAR and its management as seeking a corporate recovery in which the public has a real, if inchoate, interest. Amoskeag's windfall is irrelevant to that interest, and should not be the factor which determines whether or not BAR may sue.

Moreover, to prevent BAR from suing to recover assets wrongfully divested is to reject the use of private litigation as a deterrent to patently undesirable conduct. The management of a rail carrier —whoever it may be and whatever its private aims—is best situated to learn of wrongs to the railroad and to take effective action to redress them. The looting of a railroad and its possible decline or even failure are so clearly violative of state and federal policies, as expressed both in legislation and in the decisions of courts, as to invite the encouragement of private lawsuits as a supplement to public enforcement. See J. I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Perma Life Mufflers, Inc. v. International Parts Corp., *supra*, 392 U.S. at 139, 88 S.Ct. 1981, 20 L.Ed.2d 982. The private financial incentive for those bringing the action helps assure that it will be brought; federal and state agencies, sometimes hampered by inadequate funding or diverted by other concerns, may not be able to take the necessary action.

Thus we hold that neither the federal nor the state counts are foreclosed by the failure of BAR's principal stockholder to own its stock during the period of the wrongful conduct nor by Amoskeag's purchase of the stock from the alleged wrongdoers.

We are left with a final major question which we do not now attempt to resolve; namely, the extent, if any, to which the district court should try to insure that recovery, if any, does not benefit Amoskeag at the expense of the railroad and the public which it serves. If BAR should recover, Amoskeag's BAR stock will increase in value. An increase in stock value is a windfall which can hardly be avoided; it would not be inconsistent with the public's interest in a healthier railroad. On the other hand, a syphoning off of BAR's recovery into the pockets of present stockholders or others would be different. Hopefully, the very logic by which appellants are allowed to sue here may help to deter at least illegal distributions. In any event, we have no doubt of the power of the district court, in conjunction with any recovery, to enter orders, if appropriate, prohibiting distributions by BAR that would conflict with state or federal law. A more difficult question arises with respect to its ability to enter more sweeping prohibitions to ensure that BAR's recovery is not unreasonably diverted for the private enrichment of its stockholders.

If plaintiffs prevail, the latter is a matter which the parties and the district court may consider further, possibly with the invited assistance of state and federal agencies. Our ruling that the plaintiffs may sue is not conditioned on the devising of court-imposed limitations on the uses of any corporate recovery. Even without limitations, the public interest is better served than were civil immunity to be assured to those who may have syphoned funds from a rail carrier in violation of state and federal law. Whether a court could properly or practicably regulate (beyond existing state and federal law) the use which a carrier might make of any recovered funds, we are not prepared to decide at this time.

We understand the district court's order for summary judgment to be based solely on its determination that plaintiffs were barred from suing because of Amoskeag's failure to own stock at the time of the alleged wrongs and its purchasing of stock from alleged wrongdoers. Our decision reverses that determination; it leaves all other issues open, including the merits of plaintiffs' claims, which have yet to be tried. The district court not having ruled thereon, we express no opinion on defendants'

motion, on different grounds, to dismiss Counts II and V.

Reversed and remanded for proceedings consistent herewith.